Filed 12/11/14  In re E.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.C., a Minor. | |
| M.C., | F069227 |
| Petitioner and Respondent, | (Super. Ct. No. AT-3381) |
| v. | **OPINION** |
| U.C., | |
| Objector and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John D. Ogelsby, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioner and Respondent.

-ooOoo-

---

[*]      Before Hill, P. J., Levy, J. and Detjen, J.

U.C. (father) appeals the judgment declaring his minor daughter, E.C. (the child), free from his custody and control (Fam. Code,[1] § 7822), upon the petition brought by her mother, M.C. (mother).  On appeal, father contends that the evidence was insufficient to show he left the child with the intent to abandon her within the meaning of section 7822, and the trial court abused its discretion in granting mother's petition because it was not shown that terminating his parental rights was in the child's best interests.  We disagree with his contentions and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2005, the child was born in Bakersfield.  Father spent some time with the child before he left Bakersfield and moved to Mexico, where he lived between 2006 and 2009.

In 2008, while father was living in Mexico, mother obtained a judgment awarding her sole legal and physical custody of the child.  After father returned from Mexico, he saw the child once at the child's maternal great grandmother's house around July 4, 2009, when mother was in the hospital giving birth to one of the child's half-siblings.

Father was incarcerated from December 2010 until December 2011.  He made no child support payments until he got a steady job in January 2013, at which time his paychecks were garnished to pay his past support obligation.[2]

In September 2013, mother petitioned to terminate father's parental rights and to declare the child free from father's custody and control under section 7822.

On November 13, 2013, the family court services investigator filed a report recommending that the trial court grant mother's petition.  According to the report, mother currently lived with the child, mother's significant other, J.A., and the child's two

---

[1]     All further statutory references are to the Family Code unless otherwise specified.

[2]     At trial, father testified mother "took [him] off" child support around January 2013, and the amounts being deducted from his paycheck were for "back pay" he owed.

2

half-siblings. The child was aware of who father was but had no recollection of him and regarded J.A. as her father.

Mother told the investigator she and J.A. had been in a relationship since 2008, when the child was three years old. Mother and J.A. had two children together, a four-year-old boy and a two-year-old girl. In 2011, mother earned a Bachelor of Arts degree and was currently employed as a fraud investigator with a credit union.

Mother reported the child had expressed confusion about having a different last name than her half-siblings and wanted to drop father's last name from her legal name. It was mother and J.A.'s intention, once they were married, for J.A. to adopt the child. Mother noted she had been cautious about the amount of information she had given to the child about father, explaining the child was doing so well emotionally and academically, mother did not want to cause any disruptions.

According to mother, father had made no effort to contact mother or see the child in more than five years, he made no attempt to modify the existing custody order, and he had not provided any form of support for the child.

Father appeared in court on November 15, 2013, the court appointed counsel, and continued the hearing to January 2014. In January, the court continued the hearing to March, and ordered the investigator to file a supplemental report.

The investigator interviewed father on March 7, 2014. Father reported that he was unaware of the family court proceeding, which took place on April 21, 2008, in which mother was awarded sole legal and physical custody of the child as he was residing in Mexico at the time. According to father, he believed he and mother were still in a long-distance dating relationship and was surprised by the family court proceeding.

The investigator questioned father as to why he did not file for visitation in the family court upon his return to the United States. Father replied that he believed he was unsuitable to have the child around him at that time but now was on the right path, noting

3

he was gainfully employed and had no parole violations since his release from jail in December 2011. Father told the investigator he had planned to file to modify the custody order, but mother filed the abandonment proceeding before he was able to do so.

The matter came on for trial on March 14, 2014. On direct examination, mother testified to the lack of contact from father and his failure to exercise visitation rights and pay child support.

On cross-examination by father's counsel, mother admitted she wanted father to have little or no contact with the child, and that she had done nothing to foster contact or establish a relationship between them. Mother did not contact father or his family to let them know the address where she had been living the past five years, nor did she give father her phone number. Mother indicated in a court filing that she wanted her address to be kept confidential because she did not want him to know where she was living.

Although she was aware his family went to Mexico every summer, mother did not know father was in Mexico with his sick father in 2008, when mother obtained sole legal and physical custody of the child. Because mother did not know where father was at the time, she tried to publish notice of the custody proceedings.

After mother obtained sole custody of the child, she had some contact with father's family and would hear how father was doing, mainly through father's mother and sister. Mother never received any Christmas gifts from father for the child and she was not aware of father's mother (the paternal grandmother) attempting to call her in 2013.

Mother did not give her address to father's sister, who helped babysit the child when mother was going to college. Mother acknowledged that father's sister sent her a message on Facebook but testified "that was years ago."

Father's sister testified that the last time she saw the child was around three years ago, when the child was five years old. When asked if she made any efforts to contact mother regarding visitation with the child, father's sister testified that, "[a]t the beginning

4

where my brother wasn't here," she and the paternal grandmother would try to call mother. However, mother would not answer whenever they called, so they would "bug" mother's mother (maternal grandmother) who eventually "wouldn't answer either." The last time father's sister and the paternal grandmother tried to call the maternal grandmother to get in touch with the child was around three years ago.

When father's counsel asked father's sister whether they made any attempts to find mother between January 2013 and September 2013, father's sister testified that she and the paternal grandmother always used to call the maternal grandmother on the child's birthday and on Christmas to try to speak to the child. However, because the maternal grandmother would not answer their phone calls, "we actually stopped because I think it wasn't even worth it if she wasn't going to let [the child] see us or us to talk to her."

Father's counsel then asked father's sister if father had ever requested that she help him to locate mother. She responded: "Through Facebook. I think I texted her one time through Facebook, but she never answered me back." When asked how many times she tried to contact mother in 2013, father's sister testified: "To tell you the truth, probably like one time because that was the only time. When I texted her through Facebook, she never texted me back so I really never tried it again because she wouldn't even text back or send me a message back."

Father testified that he had known mother since they were 13 years old, but he did not know where she currently lived. He never received any messages from mother telling him where she was living. Father wanted to have a relationship with the child and paid child support, which was deducted from his paycheck.

When father's counsel asked father to describe the efforts he made to find mother between January 1, 2013 and September 13, 2013, father testified he "only went twice to her grandma's house," once at the beginning of the year and once in May. When asked if he made any inquiries into the child's location, father testified: "Yeah. I did once and

5

then they told me they don't talk to her no more" and "they don't know where she stay at." When asked if he thought he had "exhausted all attempts" to locate the child, father testified: "No. I think I could have tried harder."

Father did not return to Bakersfield during the three-year period when he was living in Mexico between 2006 and 2009. When father's counsel asked him why he went to Mexico, father responded: "I was there when my dad—and I guess I just stayed there." Father used to give money to the paternal grandmother to give to the child. The last item he asked the paternal grandmother to buy for the child was a doll in 2010. Father thought the child received the doll.

During cross-examination by the child's counsel, father acknowledged he told the investigator he did not contact the child when he got back from Mexico because he believed he was unsuitable to have his daughter around him. Father explained he did not have a job, he was drinking a lot, and he was not responsible. When father left for Mexico in 2006, he and mother used to talk on a weekly basis until she moved in with her boyfriend. Father was unable to recall when mother moved in with her boyfriend or how long father and mother kept in touch after father moved to Mexico.

After listening to the argument of counsel regarding whether the evidence established father had abandoned the child and terminating his parental rights was in the child's best interests, the trial court ruled as follows:

> "Having heard the evidence at the trial, argument of counsel, and reviewed and read and considered the Family Court Services investigation report as well as supplemental investigation report, the Court will grant the petition. And I think [mother's counsel] has articulated the issue very well. One, that the mother has no obligation to seek out the father who has clearly abandoned the child for returning to Mexico for a substantial period of time and upon his return, based upon the Family Court Services investigator's report, spent a substantial time in custody and did not provide in any direct fashion for support. The mother does not have an obligation to seek out, under these circumstances, to facilitate the father's visitation and the Court

6

finds that there's been no frustration by her part. She's simply gone on with her life and obviously that is something that this Court finds to be appropriate under these circumstances."

## *DISCUSSION*

Father's contentions on appeal essentially challenge the sufficiency of the evidence to show that he left the child with the intent to abandon her within the meaning of section 7822, and that terminating his parental rights was in the child's best interests. For reasons discussed below, we reject father's challenge.

### *A.* *Applicable legal Standards*

"Under section 7822, a court may declare a child free from a parent's custody and control if the parent has abandoned the child. Abandonment occurs when a 'parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, *or* without communication from the parent, with the intent on the part of the parent to abandon the child.' (§ 7822, subd. (a), italics added.) Thus, a section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from ... his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the part of such parent ... to abandon [the child]."' [Citation.] 'The ... failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent ... ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent ....' (§ 7822, subd. (b).)" (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010, fn. omitted.)

If the court finds abandonment, then it must consider the child's best interests before deciding whether to terminate parental rights. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 156.) The best interests of the child are paramount in interpreting and implementing the statutory scheme for terminating parental rights. (*Id.* at p. 162.)

7

Section 7890 provides that the "court shall consider the wishes of the child, bearing in mind the age of the child, and shall act in the best interest of the child."

This court applies a substantial evidence standard of review to the trial court's findings, keeping in mind that in a section 7822 proceeding, all of the trial court's findings must be made by clear and convincing evidence. (§ 7821; *In re Amy A.* (2005) 132 Cal.App.4th 63, 67 (*Amy A.*).) We cannot consider the credibility of witnesses, attempt to resolve conflicts in the evidence, or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the trial court's order, and affirm the order even if there is substantial evidence supporting a contrary finding. (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. The direct evidence of one witness is sufficient to prove a fact. (Evid. Code, § 411.)

### *B.    Analysis*

Viewing the evidence in the light most favorable to the judgment, we conclude the record discloses substantial evidence supporting the trial court's implicit findings that father left the child with the requisite intent to abandon the child within the meaning of section 7822. Father's trial testimony established that he voluntarily left the child with mother when he went to Mexico in 2006, and that, sometime during his inexplicably extended stay, he became aware mother had obtained a judgment awarding her sole custody of the child and had started a relationship with another man, after which time, contact between father and mother ceased. Despite father's apparent awareness of the custody order and that he could seek modification of the order and request visitation, father testified to making a conscious decision not to file for visitation upon his return

8

from Mexico in 2010, because he did not think he was suitable to be around the child at that time.

Although father claimed to the investigator that he later planned to file for modification of the custody order because he now felt he was on the right path, citing the circumstances that he had no parole violations since his release from jail in December 2011, and that he had found gainful employment, father presented no explanation as to what prevented him from filing for modification of the custody order and requesting visitation during the time period between his release from jail in December 2011 and September 2013, when mother filed the section 7822 petition. Father did not present any evidence or claim (as he now does on appeal) that he delayed filing because he reasonably thought he would be able to establish contact with the child without court intervention in light of the fact that he had known mother and her family since they were teenagers, and that when he finally realized court intervention was necessary it was too late because mother had already filed her petition. This theory of why father did not file for modification of the custody order was not presented to the trial court and we see no support for it in the record. Indeed, the circumstances that mother obtained sole custody of the child, began a new relationship, and stopped communicating with father prior to his return from Mexico in 2010, tend to contradict father's assertion that it would be reasonable for him to think that mother would be amenable to letting him see the child without him needing to file for visitation, when he finally considered himself ready to have a relationship with the child.

The record also provides no support for father argument that mother's alleged concealment of the child effectively prevented him from communicating with the child during the statutory period before she filed the petition and that, therefore, the presumption he intended to abandon the child, which would otherwise arise under section 7822, subdivision (b), was inapplicable. The facts here do now show concealment by

9

mother but support the trial court's conclusion that mother had simply moved on with her life. Like the trial court, we are aware of no legal authority obliging mother to make active efforts to seek out father and facilitate contact between him and the child after father voluntarily left the child and moved to another country for three years and purposefully decided not to file for visitation with the child upon his return. If father had obtained a visitation order (which he apparently knew he was entitled to do) and mother had thereafter failed to produce the child for visits, than we would be faced with a different situation. But that is not what happened here.

In any event, father presented no evidence of specific attempts by him to communicate with the child, which were directly frustrated by mother alleged conduct of concealing the child. At trial, father testified the "only" attempts he made to find the child in 2013, consisted of him going twice to the child's maternal great grandmother's house.[3] He also made some limited inquiries about the child to mother's relatives, who indicated they did not have any current information. Although father complains mother did not provide him with her address or phone number, father never testified that he actually tried to look up this information and was unable to find it, or that his failure to file for modification of the custody order or visitation was due to his not having mother's address. It appears from the record father was subject to an enforceable child support order and therefore he presumably knew which court had jurisdiction over the custody matter. Therefore, despite his suggestions to the contrary, the record does not establish that mother's concealment of her contact information was the cause of father's failure to communicate or make contact with the child during the statutory period.

---

[3]     On appeal, father faults mother for not responding to his visits to her grandmother's house in 2013, but there was no evidence mother was aware of these visits. Rather, it appears the last such visit of which mother was aware occurred around July 4, 2009, when she was in the hospital giving birth to her son.

10

Father unconvincingly suggests his sister's testimony established that mother thwarted his active attempts to communicate with the child in the year leading up to the filing of the petition. Father's sister primarily testified to efforts made by her and the paternal grandmother to contact the child by calling the maternal grandmother during the period when father was living in Mexico. According to her testimony, she and the paternal grandmother gave up trying to contact the child three years earlier due to the lack of response to their phone calls. Although father's sister testified that she sent mother a single Facebook message on father's behalf, the evidence did not conclusively establish that the message was sent in 2013, as father suggests on appeal. Mother testified she received a Facebook message from father's sister "years ago" and father's sister did not specifically testify that she sent the message in 2013, but simply repeated that she only contacted mother one time on Facebook when father's counsel attempted to elicit testimony addressing a specific timeframe in 2013. To the extent the testimony of mother and father's sister conflict regarding the timing of the Facebook message, the applicable standard of review requires us to construe the testimony in favor of the conclusion that father left the child with the intent to abandon her, and made only token efforts to communicate with her.

In arguing this conclusion was unsupported by substantial evidence, father cites *Amy A., supra,* 132 Cal.App.4th 63, and *In re Jacklyn F.* (2003) 114 Cal.App.4th 747 (*Jacklyn F.*) as instructive. In *Jacklyn F.*, the facts were that the grandparents had filed a guardianship petition, when the child had been in their care for only three days. The child's mother unsuccessfully contested the guardianship proceedings. The court stated that only the guardianship petition was granted, the child's custody was "a matter of judicial decree, not abandonment," (*id.* at p. 756) and that the mother in that case had adequately shown an intent to retain a parental role, such as by sending the child "'stacks' of letters," through the therapist for the child, and where there was confusion about her

11

visitation rights. (*Ibid.*) This conduct did not amount to showing her intent was to leave the child, although under different circumstances, there might be some possibility that a parent who stayed away from a child even after court intervention, might be found to have "left" the child, within the meaning of section 7822. (*Jacklyn F.*, at p. 756.)

In *Amy A.*, *supra*, 132 Cal.App.4th 63, the court concluded such "different … circumstances" were present. (*Id.* at p. 70.) *Amy A.* involved circumstances in which the family court awarded custody of the child to the mother and allowed the father reasonable visitation. (*Id.* at p. 66.) However, the father did not appear during the divorce proceedings, nor subsequently seek modification of the custody orders, nor make efforts to visit, nor attempt to act as a parent. This court concluded that his "repeated inaction in the face of the custody order provides substantial evidence that he voluntarily surrendered his parental role and thus 'left' [the child] within the meaning of section 7822." (*Amy A.*, *supra*, at p. 70.)

In suggesting this case is more like *Jacklyn F.* than *Amy A.*, father relies on a skewed interpretation of the facts. It is essentially father's interpretation that when he went to Mexico to tend to his sick father, mother opportunistically obtained a judgment awarding her sole custody of the child and thereafter concealed the child from father while he earnestly searched for her, realizing too late court intervention would be necessary to establish contact with the child. For reasons already discussed, the evidence below does not support the factual scenario suggested by father's argument. Even though the facts here are not identical to those in *Amy A.*, we similarly conclude that father's repeated inaction in the face of a known custody order dating back to 2008, provided substantial evidence that father voluntarily left the child within the meaning section 7822, and his failure to communicate with the child for the statutory period constituted presumptive evidence he intended to abandon the child. The presumption was not overcome by mother's alleged concealment of the child or the minimal efforts to find the

12

child described by father's testimony or by his relatives' past efforts to make contact with the child.

Finally, we reject father's contention that the court erred in granting mother's petition under section 7822, because it was not shown to be in the child's best interests to terminate his parental rights in accordance with the purpose of the statute. Section 7800 provides: "The purpose of this part is to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." Relying on the reference to "adoptive home" in section 7800, father asserts that "without commitment from the Mother's boyfriend to first marry the mother, and second to adopt E.C., it was an abuse of discretion to terminate parental rights of this father who desired to support and have contact with his daughter." Thus, father appears to be contending it is an abuse of discretion for a court to terminate parental rights under section 7822, when there is no evidence of a pending stepparent adoption. This is not the law.

In *In re Marcel N.* (1991) 235 Cal.App.3d 1007 (*Marcel N.*), where a mother sought to terminate the parental rights of her ex-husband over their two minor children pursuant to former Civil Code section 232, the predecessor statute to section 7822 (*In re J.W.* (2002) 29 Cal.4th 200, 204), claiming he had abandoned the children for more than one year. Former Civil Code section 232 stated the same standards for termination as those at issue here, and stated the same "'adoptive home'" purpose as in the present section 7800. (*Marcel N.*, at p. 1011.) In *Marcel N.*, the former husband argued the juvenile court had no jurisdiction to proceed because there were no adoptions pending.

The court in *Marcel N.*, quoting the California Supreme Court's construction of former Civil Code section 232 in a parental termination case regarding foster children, determined that one parent's rights could be terminated upon proper petition by the other parent in the absence of an "'adopting parent waiting in the wings.'" (*Marcel N.*, *supra*,

235 Cal.App.3d at pp. 1011-1012, quoting *In re Laura F.* (1983) 33 Cal.3d 826, 838 (*Laura F.*).)[4] The court noted that while the stated purpose of the subject provisions was to permit terminations where adoption was the goal, it did not prohibit such proceedings for other purposes. (*Marcel N.*, at pp. 1011-1013.) The court also pointed out that "if read literally, ... proceedings could never be used to terminate the parental rights of one parent if the second parent was providing a stable and secure home for a child" and could raise obvious equal protection problems regarding the comparative ability of remarried and single mothers to pursue the termination of a father's parental rights. (*Id.* at p. 1013; see also *In re Randi D.* (1989) 209 Cal.App.3d 624, 628 [majority holding former Civ. Code provision "contemplates severance of the parental right ... without reference to whether or not adoption proceedings are pending"].)

Here, there was substantial evidence supporting the trial court's implicit finding that termination of father's parental rights was in the child's best interests. Although mother and J.A. were not married, they had been together since 2008, the majority of the child's young life, and they had two children together. There was no indication mother and J.A. had done anything other than create a stable home life for the child and her two half-siblings. The child was reportedly doing well both emotionally and academically. Although the child knew who father was, she had no recollection of him, regarded J.A. as her father, and desired to have father's last name removed from her legal name. There is no indication in the record that the child ever wished to see father and father's inaction respecting the longstanding order granting mother sole legal and physical custody of the

---

**4** The California Supreme Court found that, despite former Civil Code section 232's same reference to "adoptive home" in its statement of purpose, there was no authority "for the proposition that termination is improper unless there is an adopting parent waiting in the wings. The statute itself imposes no duty on the superior court to make an express finding as to the prospects for adoption of a particular child." (*Laura F.*, *supra*, 33 Cal.3d at p. 838, fn. omitted.)

child, without any provision for visitation by father, was inconsistent with his stated desire to have a relationship with the child. We find there is substantial evidence to support the trial court's findings and the judgment freeing the child from father's custody and control.

***DISPOSITION***

The judgment is affirmed.