Filed 8/31/20  K.P. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| K.P., | |
| Petitioner, | F081187 |
| v. | (Super. Ct. No. JV2572) |
| THE SUPERIOR COURT OF MARIPOSA COUNTY, | **OPINION** |
| Respondent; | |
| MARIPOSA COUNTY DEPARTMENT OF HUMAN SERVICES, | |
| Real Party in Interest. | |

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  F. Dana Walton, Judge.

Eugene Action, for Petitioner.

No appearance for Respondent.

Steven W. Dahlem, County Counsel, and Kimberly G. Flores, Berliner Cohen, for Real Party in Interest.

-ooOoo-

---

[*]    Before Detjen, Acting P.J., Smith, J. and DeSantos, J.

K.P. (father) seeks an extraordinary writ from the juvenile court's orders issued at a contested 12-month review hearing (Welf. & Inst. Code, § 366.21, subd. (f)(1))[1] in May 2020 terminating his reunification services as to his now six-year-old daughter, Gabrielle P., and three-year-old son, K.J.P., and setting a section 366.26 hearing for September 2, 2020. The court terminated reunification services for the children's mother, Natasha P. (mother), at the six-month review hearing in November 2019. She did not file a writ petition. Father contends the juvenile court's detrimental return and reasonable services findings are error. We concur the reunification services provided by the Mariposa County Department of Human Services (the department) were not reasonable and grant the petition.

## PROCEDURAL AND FACTUAL SUMMARY

In March 2019, mother contacted the department and reported father was verbally and physically abusive to then five-year-old Gabrielle and two-year-old K.J.P. He slapped them on the face, back and buttocks hard enough to leave handprints. He called them " 'little b******' " and " 'stupid b******.' " He told Gabrielle, " 'mommy wants to kill daddy' " and inquired whether " 'mommy … love[d] daddy anymore.' " He also got drunk, fell down and upset the children by yelling and screaming. Mother said the abuse had been going on for five years. She did not report it sooner because she was scared. The most recent incident occurred in early February 2019 during which she stated father " 'beat the s*** out of me,' " with the children present. She provided a video taken on February 10, 2019 in which father tells Gabrielle, " 'I was telling [mother] that she hurt your feelings and she doesn't care, she doesn't care Gabrielle.' " He then turns, points to mother and yells, " 'Shut the f*** up b****,' " telling Gabrielle " 'mom doesn't care.' " Mother meanwhile can be heard repeatedly telling Gabrielle, " 'go to

---

**1**    Statutory references are to the Welfare and Institutions Code unless otherwise noted.

your room,' " " 'you're not supposed to be a part of this ….' " Gabrielle was looking back and forth at her parents during the incident.

Father admitted the children were present during physical and verbal domestic violence altercations between him and mother and that when Gabrielle witnessed the incidents, she became sad, cried and begged them to " 'please stop fighting.' "

Law enforcement charged the parents with child abuse and the department took the children into protective custody and placed them with their paternal grandparents, Leslie and Jeff. The Mariposa County District Attorney filed a complaint against the parents, charging them with multiple misdemeanor counts, including cruelty to a child.

Mother stated she was willing to do whatever was required to reunify with the children. She was living with her parents in Los Banos until she could afford an apartment. She had recently gotten a job. Father told the social worker, " 'This is all bulls*** and she (mother) is trying to get back at me for filing for full custody of my kids,' " a reference to their open family law case in Mariposa County. He denied beating the children, claiming he swatted them on the behind with an open hand. He also claimed he was never the aggressor with mother and only defended himself against her. Like mother, he was willing to do whatever it took to regain custody of the children.

The department filed a dependency petition on the children's behalf, alleging the parents' domestic violence placed the children at risk of suffering serious physical and emotional harm. (§ 300, subds. (b) & (c).) It was amended to reflect the children were taken into protective custody in March 2019.

The juvenile court ordered the children detained pursuant to the amended petition and ordered the department to provide the parents alcohol and drug testing, substance abuse treatment, parenting education, domestic violence classes and weekly supervised visitation pending its disposition of the case. The court set the jurisdictional hearing for April 10, 2019. The department arranged separate visits for the parents with the children.

The parents submitted the matter of jurisdiction on the department's report at the jurisdictional hearing on April 10, 2019 and waived time for a speedy dispositional hearing. The juvenile court sustained the allegations and set the dispositional hearing for May 1, 2019.

On April 14, 2019, a social worker met with Leslie, Jeff and the children. Gabrielle was very anxious and talked about blood, violence and imaginary creatures that hurt children. Four days later, social workers talked to Gabrielle during her visit with mother. Gabrielle was scared, upset and teary. She said she did not like it at her grandparents' home because they were mean and spanked her. She worried about her mother and constantly checked on her, asking her how she was doing. Gabrielle was very confused about what was going on in her family. She wanted to know when she was going home, where her parents were living and why she had to stay with her grandparents. That same day, the social worker observed Gabrielle during a visit with father. She was happy to see him and asked him repeatedly why he did not want to be married to her "mommy" anymore. He explained they had never been married. She was distressed and wanted to talk about the situation. Gabrielle started talking about blood and mother stabbing father with a knife. Father tried to change the subject and redirect her by playing cards and drawing pictures with her.

On April 24, 2019, the department moved the children to the home of their maternal grandparents, Noreen and Henry, in Los Banos. According to the department, Leslie and Jeff requested the move because Jeff had health problems, Leslie worked fulltime and the children's needs made caring for them overwhelming. They had not had a relationship with the children prior to their removal and the children's extreme behaviors and Gabrielle's violent conversations about stabbing and killing was disconcerting to them. Father was upset the department moved the children outside of Mariposa County without discussing it with him.

The department reported mother was employed full time and living in Los Banos. Father was employed and had an appointment for a mental health assessment. He used marijuana for physical pain from a severe leg injury. He planned to remain in Mariposa County to be near his family, his new job and support system. He understood he and the children would need services to recover from their violent trauma. He was hesitant to accept responsibility for his role in the issues that necessitated the children's removal. He wanted to participate in services and reunify with the children as soon as possible.

Gabrielle was in good physical health but had a significant speech delay, which required further assessment. She completed a mental health assessment and was referred for counseling to address her emotional and mental issues. Notably, she spoke to and pointed at inanimate objects, yelled and had a habit of speaking to strangers wherever she went. During a recent visit to the grocery store, she told a woman in line that her father and mother hated each other and she began to cry. K.J.P. also had a significant speech delay that required further assessment. He was assessed by Central Valley Regional Center (CVRC) and did not qualify for services. He was also overly friendly to strangers or isolated himself for long periods of time. He was aggressive with Gabrielle and hit her with toys, butted her with his head and screamed and yelled at her.

The department recommended the juvenile court order the parents to participate in mental health, domestic violence, substance abuse, and parenting services. The objectives of father's case plan were that he interact with the children without physical abuse or harm, demonstrate age appropriate behavior for the children, refrain from involving the children in attempts to control or intimidate and comply with any medical or psychological treatment. His case plan required him to complete a mental health assessment to evaluate his current mental health condition and follow any recommendations of the behavioral health professionals, enter into a domestic violence program through Heritage House or other department approved program to address the issues of ongoing domestic violence in the home and the effects of domestic violence on

5.

the children, schedule an appointment with Soccoro Saavedra, parenting specialist, and complete an assessment for specialized parenting classes and follow the recommendations, secure a safe and stable home, complete a substance abuse assessment through Merced County Behavioral Health Services and follow all recommendations and submit to random drug and/or alcohol testing. The department recommended the children be assessed for mental health services.

The department also informed the juvenile court the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) may apply because the paternal grandmother was an enrolled member of the Ahwahneechee-Mono Lake Piute, a nonfederally recognized tribe. In addition, mother stated she was associated with the Pascua Yaqui Tribe of Arizona.

On May 1, 2019, father's attorney objected to the department's statement in its report that Leslie and Jeff did not want custody of the children. The juvenile court granted his request for a continuance and set it for May 8, 2019. Leslie and Jeff testified at the hearing on May 8. They denied not being able to care for the children and asking the department to remove them. They simply wanted to know when to expect financial assistance so they could enroll Gabrielle in a class. Leslie told the social worker and her supervisor that Jeff needed help. It was too hard for him to make all the arrangements for visits. Father testified Gabrielle stated during a visit that she saw her mother " 'all the time' " at Noreen and Henry's home.

The juvenile court ordered the children removed from parental custody, ordered reunification services as recommended and set an interim review hearing for June 12, 2020, to address whether mother was living with the children at her parents' home and what visitation arrangements could be made for Leslie and Jeff.

In a special interim report filed for the June 12 hearing, the department informed the juvenile court Noreen denied that mother lived in her home, stating she would not allow it. She believed mother was living in Los Angeles. Father was living and working

6.

in Mariposa and had weekly supervised visits at a park in the Merced area. At a recent visit, he upset the children by arriving with two large bags of their mother's belongings and telling the children he was too sick to stay and visit. The children were upset to see their mother's belongings in bags and cried because they were not able to visit their father. On May 23, mother informed the social worker by text message that she was looking for a job in Los Angeles and wanted to complete her services there. She had not visited the children since May 2. Gabrielle was doing well and was enrolled in kindergarten in Los Banos. K.J.P. was accepted for services at CVRC but the parents did not make themselves available to sign the paperwork to begin services. The department recommended the court transfer the parents' educational rights to Noreen and Henry. The department also reported that Leslie and Jeff were working through the resource family approval process and Noreen and Henry were happy to arrange visitation for them with the children. In addition, they received notification from the Pascua Yaqui Tribe the children were not eligible for membership.

On June 12, 2019, mother's attorney informed the juvenile court mother was living in Merced. She returned from Los Angeles after being assaulted while there. The court granted Noreen and Henry educational rights for the children and confirmed the six-month review hearing scheduled for October 23, 2019.

In the six-month review report, the department recommended the juvenile court terminate reunification services as neither parent had made significant and consistent progress in complying with their case plans. The recommended permanent plan for the children was legal guardianship with Noreen and Henry or another suitable and willing relative.

Father completed mental health and substance abuse assessments but was not referred for treatment because he reported he did not believe he needed the services. He did not arrange an intake appointment for domestic violence classes until October 10, 2019, after he was informed of the department's recommendation to terminate services.

7.

He completed six of the eight required parenting classes but minimized his responsibility for the abuse and continued to blame others for the children being in foster care. Saavedra, father's parenting instructor, reported he generally arrived on time for his scheduled parenting sessions. However, his engagement was superficial. He consistently denied the need and/or benefit of parenting support. He presented with an over inflated sense of confidence in his parenting and completely rejected any notion that day-to-day parenting was a challenge for him or that his parenting was the reason his children were removed. During parenting sessions, he was typically emotionally disconnected or quick to escalate to an affective state of anger, which Saavedra speculated could be traced to his primary caretakers who failed to provide him the emotional support necessary for his social-emotional development and secure attachment. He regularly visited the children but complained the visits occurred in Los Banos rather than Mariposa. He submitted to drug testing on April 4 and October 3, 2019, and tested positive for marijuana.

Mother was homeless a significant portion of the review period. She initially lived with her parents but then moved to the home of some family friends. They treated her poorly, she claimed, so she moved to Los Angeles to be with her boyfriend. She returned from Los Angeles after she was assaulted and stayed with another family friend in Los Banos for approximately one to two weeks. She returned to Los Angeles, intending to stay there and complete her services. However, she returned to the Merced area around July 4, 2019 and entered an inpatient substance abuse program for alcohol treatment. She graduated from the program on August 31, 2019, but returned to Los Angeles on September 7 instead of going directly into transitional housing. She left a voice message for her social worker expressing her frustration, all her work was not enough for the department. She returned to the Merced area on September 18 and began staying in transitional housing. In early October 2019, she left transitional housing and moved into a house with another roommate. During the reporting period, she attended one domestic violence counseling session and five of the eight required parenting classes with

8.

Saavedra. Saavedra reported mother suffered considerable personal trauma that negatively affected her parenting. She had limited ability to respond consistently to the children and struggled to set age appropriate limits with them. She also demonstrated questionable decision making when it came to the children by repeatedly going to Los Angeles to see her boyfriend. She had not contacted the department to arrange visitation since September 5, 2019. Mother agreed reunification services should be terminated and a permanent plan ordered for the children.

Gabrielle was doing well in school and Noreen and Henry reported she was not having any behavioral problems. Although she was referred for individual counseling, she was not consistently attending because of scheduling conflicts. K.J.P. was receiving in-home services through CVRC for speech and language.

On October 15, 2019, father pled no contest to two counts of child abuse and was ordered to complete a 52-week child abuse intervention program. Mother was in training for a new job and did not appear. A warrant was issued for her appearance.

On October 23, 2019, the juvenile court set a contested six-month review hearing at father's request and scheduled it for November 6, 2019. It was continued again to November 20 on the department's motion because it was still waiting for a response from the Cherokee Tribe as to father's Indian heritage.

On November 20, 2019, counsel for father and the minors asked the juvenile court to give father more time to reunify. He was separated from mother, working two jobs and visiting the children. The court granted father an additional 60 days of services and set an interim review hearing for January 22, 2020. The court terminated mother's reunification services.

In its report for the interim review hearing, the department maintained its recommendation the juvenile court terminate father's reunification services. Although he completed some of the services in his case plan, he had not taken responsibility for his part in the children's removal. He visited them once a week in Los Banos at Noreen and

9.

Henry's home.  Although the children were excited to see him and he engaged in play with them, visits were not as productive as the department expected.  Father did not engage with the children about school, friends or other day activities.  He rarely called the home to talk to the children and did not inquire about their medical and dental appointments or school.  A pattern emerged during visitation where one or both of the children demonstrated some sort of behavioral problem periodically through the visit.  Gabrielle was strong willed and confrontational toward him and he was not open to assistance in healing his relationship with her.  Until father accepted responsibility for the trauma he caused his children and his part in their arrested emotional development, the department believed visitation would continue to be unproductive and problematic.  At the end of visitation, the children cheerfully gave father a kiss and went about their activities.

The department reported Gabrielle was exhibiting behaviors consistent with having been exposed to domestic violence and needed therapy and healing sessions with father to have a more harmonious and fulfilling relationship with him in the future.  K.J.P. had made significant developmental progress since his placement with Noreen and Henry and no longer required CVRC services.

The interim review hearing originally scheduled for January 22, 2020 was continued until February 26, 2020.  On February 26, 2020, the court set the matter for a contested hearing on March 18, 2020.

At the February 26, 2020 hearing, the department submitted a report from Saavedra dated February 21, 2020, detailing her impression of a visit she observed between father and the children on February 18, 2020.  The children greeted each other joyfully and walked to the playground.  They appeared comfortable in father's presence and spent the majority of the time on the playground engaging in various activities.  Father remained in close proximity to K.J.P. during most of the visit, acting as his "secure base."  They engaged in periods of shared joy and delight.  Father was generally

sensitive, attuned and responsive to his son. He reassured K.J.P. verbally to master new skills. By the end of the visit, he was able to swing higher on the swing with father's support and assistance. Saavedra observed, however, that father was not as responsive to Gabrielle. Although he kept an eye on her, her attempts to get his attention failed most of the time. While playing with other children, she called to him, stating she hurt her " 'private.' " He did not respond and she continued playing. When she caused K.J.P. to fall by using excessive force, father redirected her sternly while comforting K.J.P. When she persisted in getting his attention while they were eating snacks, father told her " '[there's] only one of me, Princess.' "

Saavedra concluded, based on her observations that father had difficulty sharing attention with both children and there was an "observable difference in reciprocity in the emotional bond between dad and Gabrielle, and between dad and [K.J.P.]. The favorable emotional bond appears to be between dad and [K.J.P.]." She also noted father did not bring snacks for the children and was unprepared to meet their need for food. She assisted by providing them a small bag of cookies. She also noted that father did not check KJ.P.'s diaper throughout the visit or ask Noreen at the beginning of the visit whether he needed his diaper changed.

On March 18, 2020, father's attorney informed the juvenile court he had information the ICWA might apply because father's grandfather was enrolled in a tribe. However, father did not know in which tribe his grandfather was enrolled. Father's attorney also offered the testimony of Lisa Parker, Facilitator-Program Coordinator for Mariposa Heritage House. Parker submitted four progress reports, two for the batterer intervention program and two for the child abuse intervention/parenting program, reporting father's progress in January and March 2020. The reports indicated that he participated in class discussions, completed assigned homework and demonstrated growth in his understanding of the material. Parker testified father was "doing excellent in both classes." She admitted on cross-examination that in many of the categories,

11.

father was rated as "zero" or " 'unknown' " because he had not completed enough sessions for her to properly evaluate his progress. She also confirmed that father did not enroll in the batterer's intervention program until October 10, 2019, and the child abuse intervention program until November 11, 2019.

Following Parker's testimony, the juvenile court continued the interim review hearing to April 8, 2020 and directed father and his attorney to provide the name of the grandfather's tribe. On March 27, 2020, the court vacated the hearing scheduled for April 8 on its own motion and continued the matter to April 29, 2020.

Meanwhile, the department filed a special interim report, informing the juvenile court the paternal grandmother and great-grandparents were enrolled members in the Southern Sierra Miwuk Nation, which is not a federally recognized tribe. The department attempted contact with the tribe by telephone and email but had not received a response. If the children were found to be eligible for membership, the department would work to keep the children connected to the tribal activities. The department also informed the court that all in-person visitation had ceased because of the COVID-19 pandemic and the Governor's shelter-in-place order. After father's last in-person visit on March 10, 2020, he was given the opportunity to visit the children by telephone or video chat. However, he did not take full advantage of his ability to visit, explaining he had a busy work schedule and called when he could. Between March 10 and April 15, 2020, the date of the report, he had talked with the children twice by phone. He called an additional time and spoke to Noreen and Henry who ended the call because he was verbally abusive to them and appeared to be under the influence of alcohol.

On April 29, 2020, at the continued contested interim hearing, the juvenile court continued the matter, deemed it to be the 12-month review hearing and set it for a contested hearing on May 20, 2020.

Father continued to reside in Mariposa County and was living with his parents. He was employed fulltime and continued to participate in his court-ordered services.

12.

After April 29, 2020, he had two FaceTime visits and one phone visit with the children. Noreen and Henry reported that he had no patience with Gabrielle and was mean and dismissive to her. He spoke to her in an angry tone and appeared to get angry with her no matter what she said. He treated K.J.P. differently; he was kind and patient with him. The department was assessing how to provide father in-person visits with the children but was as yet unable to do so because Noreen had "extreme health issues" and in-person visitation would place her health at risk.

Mother continued to live in Los Angeles and had no contact with the department during the reporting period. She visited the children by telephone or FaceTime.

Gabrielle was doing well in school and was not having any behavioral problems. She was referred for individual counseling but had not participated in "quite some time." On May 7, 2020, she was referred for an assessment with Mariposa County Behavioral Health. K.J.P. was participating in in-home CVRC services for speech and language delay. Noreen and Henry reported that his behavior was normal for a two year old. He had an occasional outburst but was easily redirected.

The department recommended the juvenile court find that it would be detrimental to return the children to father's custody and terminate his reunification services at the 12-month review hearing. Father did not have safe and stable housing and had not made sufficient progress in his services plan. Specifically, father did not fully understand the extent of the trauma he inflicted on the children by engaging in domestic violence with mother and had not taken appropriate steps to repair his relationship with Gabrielle, which caused Gabrielle more upset and frustration. Father's lack of understanding and acceptance of his role in the family dynamics could result in future harm to the children and necessitate the department's involvement. Although father completed the parenting program, according to Saavedra, he continued to deny needing parenting support. He remained guarded and difficult to engage and appeared disinterested during the sessions. He continued to participate in the batterer intervention program and child abuse

13.

intervention/parenting program and continued to demonstrate growth in his understanding.

On May 20, 2020, the juvenile court conducted the contested 12-month review hearing. Father was the sole witness. He denied calling the children while under the influence of alcohol. No one told him that he had been accused of doing so. He contacted the children as often as his work schedule and their school or daycare schedule allowed. He worked five days a week and had Tuesdays and Wednesdays off. He generally called the children around 4:00 p.m. or 5:00 p.m. in the evening on his days off but also called them after he got home from work. He estimated he recently talked to them four times a week. Prior to that he had difficulty getting through because no one was answering the phone. Also, only Henry had video chat capability so he had to be home for father to video chat with the children. Father contacted the social worker who informed Noreen and Henry that they needed to be available. He described his relationship with Gabrielle as "very good" and his relationship with both children as "very playful." When he called, Gabrielle was always very excited to talk to him and told him she loved him. He was doing very well in his classes with Parker. His goals were to complete the classes, gain knowledge from them and reunify with the children.

On cross-examination by county counsel, father testified he was living with his parents and the children would live there also if they were returned to him. He had not seen the video that prompted the children's removal. He had asked to see it but no one showed it to him. He did not remember the incident but did not deny that it happened. He understood his behavior caused Gabrielle great emotional distress. He was not sure whether he asked Saavedra for help in addressing the trauma he caused Gabrielle, stating, "We talked about a lot of things." He did not ask anyone whether it would be beneficial for him to participate in mental health counseling with the children. He thought that might be something he and the children could do together when they were returned to him.

Father learned in his parenting classes that children need distance, but also need to be comforted, and that his behavior affected them.  Asked whether that was all he learned, he stated, "All we did is she, basically, had me watch a different video each time."  He had not had much opportunity to apply what he learned because he had limited time with them.  He explained, "[S]olving a problem is not usually something that comes up if we are at the park and they are just having fun.  So it's hard to … enact things that I have learned when the opportunity hasn't come up."  However, he felt he was less frustrated with them and understood and listened to them more.  From his domestic violence classes, he learned that there were different kinds of domestic violence.  In the child abuse prevention classes, he learned to better understand and perceive the children's needs.  County counsel questioned why he signed up for the domestic violence class in November 2019 when it was ordered for him in May 2019.  Father explained that he talked to Parker about the class in June or July 2019 but had to wait until November for an opening.

Father disagreed that he treated the children differently, explaining that K.J.P. was younger and sometimes required more attention.  Other than that, he tried to find things to do with them together.  He did not know if K.J.P. was receiving CVRC services because no one informed him.

On redirect examination, father's attorney asked him whether anyone suggested he participate in counseling with the children to work through the children's exposure to domestic violence.  Father stated no one had, "Otherwise, I would have done it."

Following father's testimony, county counsel informed the juvenile court the Southern Sierra Miwok Tribe was not a federally recognized tribe and did not wish to intervene.  County counsel affirmed the department's recommendation, arguing father was going through the motions of participating in reunification services but had not benefitted from them.  "He's not applying them to his relationship with his kids.  He's

15.

doing nothing to repair the damage that he's inflicted on his kids, particularly with Gabrielle." "[H]e's done too little too late …."

Father's attorney and minors' counsel argued father should be given additional time to reunify because the department did not provide him services to address his relationship with the children. Minors' counsel also argued there was a substantial probability the children could be returned to his custody.

The juvenile court questioned how much more time father needed and what would change in that time if there were no plan for the children if they were returned to his custody. After a lengthy conversation between the court and counsel, the court found the ICWA did not apply, ordered that the children remain dependents of the court and terminated father's reunification services. The court found that the department provided father reasonable reunification services but that he made minimal progress and there was not a substantial probability the children could be returned to his custody with an additional period of reunification services.

This petition ensued.

## DISCUSSION

Dependency proceedings have the dual purpose of protecting the welfare of the dependent child and safeguarding the parent's right to properly raise their own child. (*In re La Shonda B*. (1979) 95 Cal.App.3d 593, 599.) If the child is removed from parental custody, the primary objective is to reunify the child with his or her family. (§ 202, subd. (a).) "The foundation and central, unifying tool in child welfare service is the [reunification] plan. The [reunification] plan must provide for the child's care and case management and must provide services that facilitate both return and, concurrently, permanency." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020 ed.) Disposition Hearing, § 2.129[4].) Reunification, however, is not an open-ended process. Consequently, the dependency statutes place a limit on its duration and require the

juvenile court to monitor its progress by conducting periodic review hearings at six-month intervals.  (§§ 361.5, subd. (a); 366, subd. (a)(1).)

The first determination the juvenile court must make at each review hearing is whether returning the child to parental custody would create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being.  Unless the court finds by a preponderance of the evidence the child's return would create a substantial risk of detriment, the court must return the child to the parent.  (§ 366.21, subds. (e)(1) & (f)(1); 366.22, subd. (a)(1).)  If the court does not return the child, it must determine whether the parent was provided reasonable reunification services.  The court may not terminate reunification services at the 12-month review hearing and set a section 366.26 hearing unless it finds by clear and convincing evidence the services provided were reasonable.  (§ 366.21, subd. (f)(1).)

We review the juvenile court's findings for substantial evidence.  (*In re Amy A.* (2005) 132 Cal.App.4th 63, 67.)  In so doing, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  When the juvenile court is required to apply the clear and convincing standard of proof, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

I.      *Detrimental Return*

In evaluating the detriment associated with the return of a child to parental custody, the underlying question is whether the child would be safe.  A parent's participation in his or her reunification plan is some indication of whether return would be detrimental.  Indeed, the failure to regularly participate and make substantive progress

in court-ordered services constitutes prima facie evidence of detriment. (§ 366.21, subd. (f)(1).) However even technical compliance, though significant, is not conclusive evidence a parent does not pose a risk of detriment to his or her child. The court must still consider whether the parent eliminated the conditions leading to the child's removal and be satisfied the child would be safe in parental custody. (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

The risk of detriment, in this case, was father's propensity for violence. The children were removed from his custody because he physically and emotionally abused them and exposed them to physical and emotional domestic violence altercations between him and mother. Though father was demonstrating growth in his batterer and child abuse intervention classes by the 12-month review hearing, it was too soon to fully assess his progress. In addition, he was resistant to improving his parenting skills, appearing disengaged and disinterested during his sessions with Saavedra, the parenting specialist. The department did not believe father had gained sufficient insight into how his behavior harmed the children or taken steps to repair his relationship with them. Consequently, there was a risk he would endanger them if they were returned to his custody. On that evidence, the juvenile court could find by a preponderance of the evidence the children would be at risk if returned to father's custody.

## II.    *Reasonableness of services*

The purpose of reunification services is to place the parent in a position to gain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) To that end, the department must devise a reunification plan tailored to the unique needs of the family and make a good faith effort to help the parent access the services the plan provides. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The adequacy of reunification plans and the reasonableness of the [department's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "To support a finding reasonable services were offered or provided, 'the record

should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

In light of the allegations of the petition, the department adopted a reunification plan for father designed to help him interact with the children without physical abuse or harm. He was provided mental health and substance abuse assessments, a specialized parenting program and a 52-week domestic violence program. The children were also provided mental health assessments and treatment.

Early in the proceedings, father separated from mother and there were no further incidents of domestic violence. He also completed mental health and substance abuse assessments and did not require treatment. By October 2019, he completed the parenting program but had only begun the domestic violence program. By the 12-month review hearing in May 2020, he established a home with his parents, was doing "excellent" in his domestic violence and child abuse classes and visiting the children by phone or video calls. In her last report dated February 18, 2020, Saavedra observed that father had difficulty dividing his attention between the children and appeared to have a stronger emotional bond with K.J.P.

The department's recommendation to terminate father's reunification services at the 12-month review hearing was based on his last minute efforts to participate in services and failure to repair his relationship with the children. The attorneys for father and the children vehemently argued father had done everything asked of him and the department expected father to repair his relationship with the children without providing him a service tailored to that need. Minors' counsel stated, "I don't think it's reasonable

19.

to expect … a lay person … to know what services [he needs] to mend the fences with [his] children." "[I]f the Department needs [father] to do something, they need to tell him what to do and shouldn't fault him for not having the insight to know 'I needed this counseling or I need that counseling.' "

The juvenile court faulted father for being aware that he needed help repairing his relationship with the children, particularly Gabrielle, and not asking for it, citing the fact that it was mentioned in the reports. The court also inferred that he precluded such help by his answers to the mental health assessor. The court stated, "[I]f he's unable to be aware of that issue when it's in the reports and been discussed by all of the parties, you are suggesting that it's the Department's job to go to [father] and say, '[Mr. P.], since you have a problem with Gabrielle, shouldn't we have some more services,' when [Mr. P.], in his own testimony, says, 'There's no problem with me and Gabrielle.' "

We asked the parties to file supplemental briefing on the issue of reunification services because it is clear they and the juvenile court realized father could not reunify without some form of therapy to help him repair his relationship with the children. However, it is not clear from the record which service, if any, addressed that need.

Real party in interest argues the mental health component of his services plan would have assisted him had he been forthcoming with the clinician who assessed him. Because he was not, it contends, he purposefully avoided the issue and has only himself to blame. There is no evidence, however, that mental health counseling was included to address father's relationship with the children. The plan required him to be assessed and participate in treatment only if indicated. Father cannot be faulted for answering the clinician's questions in a way that disqualified him for treatment.

Real party also argues the specialized parenting program father had with Saavedra would have provided him the therapy he needed had he been receptive. The record describes the program, the Circle of Security, as a "relationship-based parenting program," which consisted of eight (8) video sessions and "parent-child visits." Saavedra

20.

explained the parent-child visits are "observed in order to assess the caregiver's progress and ability to implement the parenting skills and concepts introduced in the program." Real party asserts that the program includes "joint sessions with the parent and child" and that although Saavedra is not identified as a " 'parenting coach,' " such was her role. Real party also asserts the parenting program included a "therapeutic component" and "[t]herapeutic visitation between [father] and the children was offered as part of the specialized parenting program." The record, however, including the page citations provided, do not bear that out. There is no evidence the parenting sessions were therapeutic in nature. For example, there are no descriptions in the record of Saavedra engaging with father during visits or counseling or advising him on his parenting technique. On the contrary, it appears based on Saavedra's reports that her role was instructional and observational. Nor is there any evidence therapeutic visitation was a component of the parenting program.

We are struck by the notion that it was incumbent on father to pursue the therapy the department believed he needed. If he had as little insight as the department believed, it was unlikely he recognized his need for therapy. Even if he did, it is the department's duty to identify and arrange the services to assist the parent. By January 2020, the department was aware that father's ability to relate effectively with the children during visitation and ultimately reunify was dependent upon his acknowledgement of the trauma he caused them. The department also identified Gabrielle's need for therapy and healing sessions with father to have a more harmonious and fulfilling relationship. Yet, the department's reports are silent as to how that issue was being addressed in father's current case plan or could be with additional services.

The reunification plan is a fluid—not static—document. The services it identifies must be specific and internally consistent with an overall goal of resumption of a family relationship. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 678.) If it is not integrated to achieve that goal then the department—not the parent—has a duty to fill that void.

Because the department expected father to have repaired his relationship with the children without providing him a service tailored to accomplish that, we conclude father was not provided reasonable reunification services.

We therefore grant the petition and direct the juvenile court to provide father an additional six months of reunification services designed to reunify him with his children. In so doing, we are mindful that our decision effectively continues this case to a 24-month review hearing, well beyond the 18 months allowable by statute. (§ 361.5, subd. (a)(3)(A).) Nevertheless, courts have held that a sustained challenge to the adequacy of services will justify the extension of services beyond 18 months. (See *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1256.)

## DISPOSITION

Let an extraordinary writ issue directing the juvenile court to vacate its May 20, 2020 finding that reasonable services were offered or provided to father and its orders terminating reunification services and setting a section 366.26 hearing. The court shall enter a new and different finding that reasonable services were not offered or provided to father. The court shall conduct a continued 12-month review hearing at the earliest convenient time and direct the department to file an amended case plan incorporating family therapy and therapeutic supervised visits and any other services that would enhance father's relationship with the children. At the continued 12-month review hearing, the juvenile court shall provide father an additional period of reunification services. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.

22.