[No. D046032. Fourth Dist., Div. One. Aug. 24, 2005.]

In re AMY A., a Minor.
DALE A., Petitioner and Respondent, v.
QUENTIN A., Objector and Appellant.

COUNSEL

Valerie N. Lankford, under appointment by the Court of Appeal, for Objector and Appellant.

Michael D. McGlinn for Petitioner and Respondent.

Alice C. Shotton, under appointment by the Court of Appeal, for Minor.

OPINION

**IRION, J.**—Quentin A., the biological father of Amy A., appeals from a judgment terminating his parental rights on the basis of abandonment under Family Code section 7822[1] so that Amy can be adopted by her stepfather, petitioner Dale A.[2] Quentin contends that he did not, as required for a finding of abandonment under section 7822, "leave" Amy in the care and custody of another person and did not intend to abandon her. We reject Quentin's arguments and affirm the judgment terminating his parental rights.

### FACTUAL AND PROCEDURAL BACKGROUND

Amy A., who is currently seven years old, is the child of Sarah A. and Quentin A. Sarah and Quentin were married in February 1997, and Amy was born in January 1998. In March 1998 when Quentin was discharged from the

---

[1] All further statutory references are to the Family Code.

[2] For confidentiality reasons, we refer to the parties by their first names and intend no disrespect.

Marine Corps, Sarah, Quentin and Amy moved from California to Quentin's hometown in Indiana, and took up residence in the home of Quentin's parents.

Within months, Quentin and Sarah began having marital problems, and Sarah requested that they attend counseling. Quentin stated that he did not want to be married anymore. He suggested that Sarah move out of his parents' house and take Amy with her back to California. In April 1999 Sarah and Amy returned to California to live in the home of Sarah's parents in San Bernardino, where they stayed until October 1999.

While living at her parents' house, Sarah tried to maintain contact with Quentin by calling him and sending letters and pictures of Amy, but Quentin did not attempt to contact Sarah or Amy during this time and refused to talk to Sarah when she called his parents' house.

In October 1999 Sarah and Amy moved into their own residence in San Bernardino. Sarah gave her new contact information to Quentin, his parents and his brother.

Sarah filed for divorce in San Bernardino County, and the divorce was granted in April 2000. Quentin testified he did not attend the divorce hearings because he could not afford to, although he did not approach his parents for funds. In the divorce, Sarah was granted sole physical and legal custody of Amy. Quentin was given reasonable visitation with Amy in California and ordered to pay child support of $385 per month. Quentin admitted to receiving a child support order and knowing that he owed child support, but claimed he did not know the amount he was supposed to pay. Quentin did not make any support payments until after the section 7822 proceedings were instituted in November 2004.

While in San Bernardino, Amy had medical emergencies that required surgeries and at least 10 hospitalizations. Sarah left information with Quentin's family members about each of the hospitalizations and mailed Quentin information about them. He did not call to see how Amy was doing and sent no money to assist with the medical expenses. Quentin testified that he sent Sarah insurance forms so that Amy could obtain coverage through his medical insurance, but Sarah denied ever receiving the forms or knowing about the availability of the insurance.

Quentin did not have any contact with Sarah or Amy for over two years: from April 1999 to July 2001. Then, in July 2001, during a trip to California, Quentin appeared unannounced at Sarah's home. Quentin introduced himself to Amy as a family friend named "Q" and stayed for approximately 30

minutes. Quentin next had contact with Amy in December 2001 when Sarah and Amy went to Indiana to visit Sarah's sister, who was married to Quentin's brother and lived across the street from Quentin and his parents. During the visit, Quentin twice accepted Sarah's invitations to go to restaurants with her, her sister's family, and Amy. Quentin again introduced himself to Amy as "Q."

Sarah married Dale A. in July 2002 and moved to San Diego in September 2003. Quentin testified that he never contacted Amy after December 2001 because Sarah had moved to San Diego and "cut off contact" with him. Quentin also testified, however, that he made no attempt to find out Sarah's new address from family members such as Sarah's parents or Sarah's sister. Sarah testified that she did not ask her sister and brother-in-law to withhold her San Diego address from Quentin, and they had her address because they had visited her several times in San Diego.

On November 19, 2004, Dale filed a petition to declare minor free from parental custody and control to terminate Quentin's parental rights so that Dale could adopt Amy. In a report that the San Diego County Health and Human Services Agency (Agency) prepared for the section 7822 proceeding, the Agency recommended that Quentin's parental rights be terminated because Quentin had not contacted Amy since December 2001 nor made provisions for her care. Amy's attorney agreed that it was in Amy's best interests that Quentin's parental rights be terminated. After visiting with Amy, her attorney concluded that Amy has a parental relationship with Dale and does not seem to know that Quentin is her father.

The trial court granted the petition to terminate Quentin's parental rights, finding by clear and convincing evidence that Sarah's testimony was credible, Quentin's testimony was not credible, and adoption by Dale was in Amy's best interests.[3]

## STANDARD OF REVIEW

█ We apply a substantial evidence standard of review to the trial court's findings. (*In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1212 [230 Cal.Rptr. 332].) We apply this standard keeping in mind that in a section 7822 proceeding all of the trial court's findings must be made by clear and convincing evidence. (§ 7821.)

---

[3] The petition also sought to terminate Quentin's parental rights under section 7825, subdivision (a), on the basis that Quentin had been convicted of a felony and that the facts of the crime proved he was unfit to have future custody and control of Amy. The trial court did not base the termination of Quentin's parental rights on his felony conviction and, at minor's counsel's request, dismissed the section 7825 allegations.

## DISCUSSION

A proceeding to have a child declared free from the custody and control of a parent may be brought pursuant to section 7822 "where the child has been left . . . by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent . . . , with the intent on the part of the parent . . . to abandon the child." (§ 7822, subd. (a).)

■ A parent's "failure to provide support[] or failure to communicate" with the child for a period of one year or more "is presumptive evidence of the intent to abandon," and "[i]f the parent [has] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ." (§ 7822, subd. (b).) The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period. (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 885 [20 Cal.Rptr.2d 291] [construing predecessor statute].)[4] However, "[t]he fact that a parent has not communicated with a child . . . or that the parent intended to abandon the child does not become material . . . unless the parent has 'left' the child" within the meaning of section 7822. (*In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 754 [7 Cal.Rptr.3d 768] (*Jacklyn F.*).)

A

### *Quentin "Left" Amy in Sarah's Care and Custody Within the Meaning of Section 7822*

Quentin argues that the trial court erred in terminating his parental rights because substantial evidence does not support a threshold finding that Amy was "*left* . . . by one parent in the care and custody of the other parent." (§ 7822, subd. (a), italics added.) Quentin argues that he did not "leave" Amy in the care and custody of Sarah, but rather that "it was Sarah who took Amy from [his] *physical custody* [a]nd it was the subsequent court order in the divorce proceeding which took *legal custody* from [him]." Quentin argues that " 'actual desertion' " is required for a finding of abandonment under section 7822, which did not exist here because Sarah and the judicial custody

---

[4] Section 7822 became operative in 1994. (Stats. 1992, ch. 162, § 10, p. 464.) The language that currently appears in section 7822, requiring as a prerequisite for abandonment that a child be "left" in the care and custody of another person, previously appeared in nearly identical form in former Civil Code section 232, subdivision (a) (Stats. 1961, ch. 1616, § 4, p. 3504), and prior to that, in former Welfare and Institutions Code section 701 (Stats. 1937 ch. 369, § 701, p. 1031). Much of the case law that we cite herein interpreting the meaning of that language was decided under the previous statutory provisions.

order removed Amy from his care and custody. As we explain, *post*, we reject Quentin's arguments because substantial evidence supports a finding that although Sarah physically took Amy away to California, Quentin voluntarily surrendered his parental role, and his inaction in the face of the judicial custody order provides substantial evidence that he "left" Amy in Sarah's care despite the existence of that order.

 1. *Substantial Evidence Supports a Finding that Quentin "Left" Amy Within the Meaning of Section 7822 Despite Sarah's Move with Amy to California*

We first examine Quentin's argument that because Sarah was the one to physically move with Amy to California, he cannot have "left" Amy in Sarah's care and custody within the meaning of section 7822. Having reviewed the relevant case law, we conclude that a parent may be found to have "left" a child in another person's care and custody within the meaning of section 7822 even when the child moves away with the other parent.

Although case law refers to the leaving of a child in another person's care and custody as " ' "*an actual desertion*" ' " by the parent, case law also clarifies that a parent "leaves" a child by " '*voluntarily surrender[ing]*' " the child to another person's care and custody. (*In re George G.* (1977) 68 Cal.App.3d 146, 160 [137 Cal.Rptr. 201], quoting *Guardianship of Snowball* (1909) 156 Cal. 240, 243 [104 P. 444, 7 Cal.Unrep. 371]; *Matter of Cozza* (1912) 163 Cal. 514, 528–529 [126 P. 161].) Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent. "According to Webster's International Dictionary, 'leave' means 'to put, deposit, deliver, or the like, so as to allow to remain;—with a sense of withdrawing oneself from; as *leave* your hat in the hall; we *left* our cards.' Thus the term appears to connote *voluntary* action." (*In re Cattalini* (1946) 72 Cal.App.2d 662, 665 [165 P.2d 250], final italics added; see also *In re George G., supra*, at p. 160 [to constitute abandonment the "leaving must be *voluntary* and abandonment does not occur when the child is taken from parental custody against the parent's wishes," italics added]; *In re Jones* (1955) 131 Cal.App.2d 831, 834–835 [281 P.2d 310] ["Abandonment is not established by acts of relinquishment committed *under circumstances of coercion*," italics added]; *Matter of Cozza, supra*, at pp. 528–529 [mother did not "leave" a child in the care and custody of another when the child was taken "without the consent of the mother and against her wishes and desire" and she "endeavored . . . to secure the return of the child"].)

In this case, we conclude substantial evidence establishes that Quentin voluntarily surrendered his parental obligations and Amy was not taken from Quentin's care and custody under coercion or against his wishes. Quentin

suggested that Sarah move out of his parents' house and take Amy with her to California. Despite Sarah's overtures, he made no attempt to stay involved with Amy, did not ask Sarah and Amy to return, provided no funds for Amy's care, and did not request to take custody of Amy even for a short visitation although he was entitled to do so. Instead, he appears to have done his best to ignore Amy and his parental role. Moreover, the record contains no evidence that Sarah attempted to prevent Quentin from being involved in Amy's care; on the contrary she sought him out, but he refused any involvement.

### 2. *The Judicial Custody Order Does Not Preclude a Finding that Quentin "Left" Amy Within the Meaning of Section 7822*

Next, we examine Quentin's argument that the court order giving custody to Sarah precludes a finding that he "left" Amy in Sarah's care and custody. Quentin relies on *Jacklyn F.*, which concluded that the parent did not "leave" her child within the meaning of section 7822, because a judicial order had taken custody away from her. (*Jacklyn F., supra*, 114 Cal.App.4th at p. 756.) Because of the distinctly different factual circumstances in *Jacklyn F.*, we conclude that case does not support Quentin's argument.

In *Jacklyn F.*, the child was taken from the mother by a judicial order making the paternal grandparents the guardians of the child. The mother had been absent only three days when the grandparents filed a petition for guardianship, and the mother contested the petition. (*Jacklyn F., supra*, 114 Cal.App.4th at p. 756.) After the child was removed from her custody, the mother attempted to stay involved with the child by sending stacks of letters. Thus, the court concluded that the mother had not "left" the child, but rather "the minor's custody status became a matter of judicial decree." (*Ibid.*) The court was careful to point out, however, that under certain circumstances "it might be proper to conclude that a parent has 'left' a child . . . despite court intervention." (*Ibid.*) We conclude that those circumstances exist in this case.

Quentin did not appear during the divorce proceedings and made no attempt in the following years to seek modification of the custody order. Although the custody order gave Quentin visitation rights, he made no effort to exercise them. He did not provide for Amy's care, participate in her medical emergencies, or have any kind of a parental relationship with her. Quentin's repeated inaction in the face of the custody order provides substantial evidence that he voluntarily surrendered his parental role and thus "left" Amy within the meaning of section 7822. (See *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816 [156 Cal.Rptr. 765] [concluding that the mother "left" her child when she did not seriously attempt to obtain visitation or a change in the order removing the child from her custody].)

B

*Substantial Evidence Supports a Finding that Quentin*
*Intended to Abandon Amy*

Quentin also argues that he did not *intend* to abandon Amy, which is a separate required element under section 7822. (*Id.*, subd. (a) [parent must have left the child in the other parent's care "with the intent . . . to abandon the child"].)

The undisputed fact that Quentin had no communication with Amy and provided no child support for over one year gave rise to a presumption that Quentin intended to abandon Amy (§ 7822, subd. (b)), but Quentin contends he rebutted that presumption. He argues that he "did take action which demonstrated he did not intend to wash his hands of his child. He put his daughter on his medical insurance; he traveled to California to visit her; he intended to seek custody of Amy, but Sarah got to the courthouse first; and he opposed the petition to terminate his parental rights." Quentin also points out that although he did not pay child support, Sarah never asked him to do so.

 We reject Quentin's argument because the record shows that Quentin failed to rebut the presumption of his intent to abandon. First, Quentin's testimony that he attempted to put Amy on his medical insurance does not preclude a finding of abandonment because the trial court was entitled to credit Sarah's testimony that she never received any medical insurance information from Quentin. Second, Quentin's three short visits with Amy over the span of six years do not preclude a finding that he intended to abandon Amy because he made those visits under the guise of being a family friend rather than her father, and the visits took place before December 2001 when the statutory one-year abandonment period commenced. Third, Quentin's claim that he would have sought custody of Amy if Sarah had not beat him to it does not preclude a finding of intent to abandon. Quentin did not appear in the custody proceedings, never attempted to obtain a modification of the custody order, and did not meaningfully exercise the visitation rights given to him in the custody order. Fourth, the fact that Quentin opposed the petition to terminate his parental rights is not relevant because the proper inquiry is whether he intended to abandon Amy during the one-year statutory period before the petition was filed. (*In re Daniel M., supra,* 16 Cal.App.4th at p. 885.) Finally, the fact that Sarah did not ask Quentin to make the legally required child support payments does not negate the fact that Quentin indisputably provided no support to Amy.[5] In sum, we conclude, contrary to

---

[5] Furthermore, the trial court was entitled to view as incredible Quentin's testimony that although he received the support order it did not set forth the amount he was required to pay

Quentin's assertions, that substantial evidence supports the trial court's decision that Quentin left Amy in Sarah's care and custody with the intent to abandon her for the statutory period set forth in section 7822.

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., and Aaron, J., concurred.

---

and to view negatively Quentin's admission that he did not follow up to find out the amount he owed.