Filed 8/18/23  In re Tristan G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re TRISTAN G., a Person Coming Under the Juvenile Court Law. | |
| SERGIO M., | F085911 |
| Petitioner and Respondent, | (Super. Ct. No. BAT-21-003073) |
| v. | |
| K.G., | **OPINION** |
| Objector and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Valerie N. Lankford, under appointment by the Court of Appeal, for Objector and Appellant.

Jeremy D. Swanson for Petitioner and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Franson, J. and Smith, J.

Appellant K.G. (mother) appeals from the trial court's judgment terminating her parental rights to her son Tristan G. (born October 2014) due to abandonment pursuant to Family Code section 7822.[1]  From approximately January 2018 to July 2021, mother made no attempt to set up professionally supervised visitation as required by the custodial order between her and Sergio M. (father), but did send father text messages requesting to see Tristan and sent a few gifts throughout the years.  Father obtained a judgment freeing Tristan from mother's parental custody and control after the court found that mother's texts and gifts were merely token efforts to communicate.  On appeal, mother argues there was insufficient evidence to prove she "left" Tristan in father's care and custody, or intended to abandon him within the meaning of section 7822.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**Father's Petition and Mother's Response**

Mother and father are the unmarried parents of Tristan.  In October 2021, father filed a "Petition to Declare Minor Free From Parental Custody and Control" pursuant to section 7822.  In his petition, he declared he had sole legal and physical custody of Tristan and that, although mother had supervised visitation rights, she had not attempted to communicate with or visit Tristan for more than one year.  He said mother had not seen Tristan since January 2018[2] and had not provided financial assistance for his care.  In response, the trial court issued a citation to be served on mother and set a hearing on father's petition.

Mother filed a response denying the allegations.  She stated she tried to communicate and have visits with Tristan, and sent presents to Tristan on his birthday and Christmas.  She attached a copy of an order confirmation for a gift she sent to

---

[1]     All further statutory references are to the Family Code.

[2]     Mother testified she had not seen Tristan since December 2017.

paternal grandmother's address. Additionally, she attached copies of numerous text messages she sent father in 2020 and 2021.

**Family Court Services Investigator's Report**

Family Court Services Officer Sharon Sutherland conducted the trial court's investigation. Tristan was interviewed alone and identified his family as his "mom, dad[,] and sister with whom he lives."[3] He was asked if he remembered having a different mother when he was younger, which he acknowledged. However, he said he did not remember anything good about spending time with her and described her as his " 'bad mom.' " He did not want to see her and did not consider her his mother.

Sutherland reported mother and father had a brief encounter that resulted in her pregnancy. In 2016, father was granted primary custody of Tristan with visits for mother. In 2018, father filed a petition to modify visits, alleging mother was homeless and living with an abusive boyfriend. Mother denied the allegations, but did not appear for the hearing. Father was granted sole custody with once weekly professionally supervised visits for mother. Father reported that after the hearing, mother texted him to ask him about Tristan. He informed her of the supervised visits and asked her to contact his attorney. She continued to text him, but he eventually blocked her phone number.[4] Father stated he was more than willing to cooperate with the supervised visitation agency, but he was never contacted about setting up visits. Three years later, he started the process of setting up supervised visitation, but chose to pursue the abandonment proceedings instead.

Mother reported she was granted supervised visitation in 2018, but did not appear at the hearing because she did not have transportation. She said she attempted to contact

---

**3**    Tristan was referring to his stepmother.

**4**    Father later clarified he did not block her phone number. Rather, he "muted" her text messages so that he would not see them.

father about visits and asked about Tristan's well-being numerous times. She provided copies of text messages from 2018, 2019, 2020, and 2021, but admitted she never attempted to exercise her court ordered supervised visits until July 2021. Father responded to text messages in 2018 and 2019, but not in 2020 and 2021. Mother said she never attempted to modify the family court orders because she wanted to show the court she was stable. Mother moved from Bakersfield to Lancaster in 2018, which made exercising her right to supervised visits difficult. However, she had been back in Bakersfield for 18 months and signed up for supervised visits in July 2021, but stated father did not contact the agency to set up visits.

Sutherland concluded that it did not appear it was father's actions that prevented mother from having a relationship with Tristan; rather, it was mother's inaction. It had been three years since she had any face-to-face contact with Tristan. Although she provided text messages that showed she asked about Tristan, she did not take any action that would result in seeing him as court ordered. Father believed he did not have any obligation to interact with her because of the court order. Sutherland opined the allegations appeared to be true and granting the petition would be in Tristan's best interest. She recommended father's petition be granted.

**Trial**

On October 14, 2022, the court held a trial on father's petition. The court took judicial notice of the family court orders, received into evidence the investigative report and the parties' exhibits, and heard testimony from mother, father, and mother's boyfriend, O.F.

### *Mother's Testimony*

Mother testified she had not seen Tristan since he was three years old, but was aware that she could have supervised visits. However, she did not begin the intake process for visits until July 2021. Nor did she file a request to modify the custody order or request unsupervised visits. Mother further testified she had offered to send clothes,

4.

money, and any other things Tristan might need to father since 2018. She said she was willing to pay child support, but never did. She said she sent clothes and toys three to four times since 2018.

Mother said that in 2018 she went to Heaven's House to inquire about supervised visits, but visits did not occur. Staff told her "it could be upwards of hundreds of dollars per visit." She did not do the orientation due to the fees. At that time, she was living in Lancaster and was unemployed, which she let father know. Prior to the 2018 custody order granting mother supervised visits, father had agreed to transport Tristan to her location once a month, but father did not follow through with the plan. She said she made various requests to video chat or visit Tristan between 2018 and 2020, but father would not respond to her text messages. In 2020, she moved back to Bakersfield from Lancaster, but did not start the intake process at the supervised visitation facility until July 2021. Prior to 2021, she did not have money to exercise her supervised visitation rights. However, she acknowledged there were multiple bus lines that went from Lancaster to Bakersfield, and in 2019, her boyfriend would give her rides to Bakersfield once a month. She also paid her roommates to give her rides at that time. In 2020, she moved back to Bakersfield and acquired her own vehicle. Additionally, she was employed in 2020 and 2021.

### *Father's Testimony*

Father testified that after the court granted him sole custody with supervised visitation for mother, he immediately went to the visitation facility and completed the paperwork and paid the intake fee. The court admitted into evidence the intake form father completed dated June 2018. However, he was never contacted to begin visits until July 2021. Father stated he did not see the text messages mother sent him requesting to see Tristan because he "muted" her. Mother had requested to see Tristan in an unsupervised setting and father did not feel comfortable going against the court order, which required supervised visitation at a facility. He recalled mother sent Tristan toys for

Christmas in 2018 and his birthday in 2019. He did not remember receiving clothes. When he was contacted in July 2021 by the supervised visitation facility, he did not complete the intake process and instead filed the petition for abandonment. Father acknowledged mother asked him for his address several times since 2018, but he did not provide it to her.

### O.F.'s Testimony

O.F. was mother's boyfriend and testified that in July 2021, he reached out to father to try to set up visitation. He first called father, but father told him he had the wrong number and hung up. He then sent father a text message, but father did not respond.

### Court's Ruling

After hearing testimony and argument, the trial court took the matter under submission and provided a written decision. In its written decision, the court stated:

> "[Mother's] inquiries about the minor's well-being or periodic requests to see Tristan … were not permitted by the existing court order. … The [c]ourt finds that [mother's] efforts to communicate by sending text messages to [father] to be only token efforts to communicate with Tristan. [Mother] was certainly aware of the court order for supervised visitation and had contacted Heaven's House to inquire about the process to sign up for visitation. Yet, for over three years, knowing this was the way for her to see Tristan, she made no effort to set up visitation as provided by the court order. Nor did she make any effort to return to court to modify the orders that were granted. … While she has alleged that she did not have the money to have supervised visitation at Heaven's House, she was able to afford to pay rent and other living expenses at the time the order for supervised visitation was made. She was employed in 2019 and again in 2020. She had a vehicle to work for Door Dash in early 2020. These facts belie her statement that she could not afford supervised visitation until 2021."

The trial court also considered the gifts she sent to be token efforts and found that father had not acted as a " 'gate keeper' " preventing mother from having visitation. The

6.

court found there was clear and convincing evidence that mother voluntarily relinquished her parental role and that it was in Tristan's best interest to terminate parental rights.

On March 14, 2023, mother filed a notice of appeal.

## DISCUSSION

Section 7800 et seq. governs proceedings to have a minor child declared free from a parent's custody and control. (§ 7802; *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1009 (*Allison C.*).) "The purpose of such proceedings is to promote the child's best interest 'by providing the stability and security of an adoptive home.' (§ 7800.) The statute is to 'be liberally construed to serve and protect the interests and welfare of the child.' " (*Allison C.*, at pp. 1009–1010.) "A declaration of freedom from parental custody and control … terminates all parental rights and responsibilities with regard to the child." (§ 7803.)

A court may declare a child free from parental custody and control if the parent has abandoned the child. (§ 7822; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.) Abandonment may occur when "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) "The failure to provide … support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent … ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent …." (*Id*. at subd. (b).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68 (*Amy A.*).) It is not required that the statutory period be the period immediately preceding the filing of the petition. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 922.)

When an appellate court reviews a trial court's finding under section 7822, the substantial evidence standard of review applies. (*Allison C.*, *supra*, 164 Cal.App.4th at

7.

p. 1010.)  Under the substantial evidence standard of review, all conflicts in the evidence must be resolved in favor of the respondent and all legitimate and reasonable inferences must be indulged in to uphold the judgment.  (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549.)  "Abandonment and intent ' "are questions of fact for the trial judge ….  His [or her] decision, when supported by substantial evidence, is binding upon the reviewing court.  An appellate court is not empowered to disturb a decree adjudging that a minor is an abandoned child if the evidence is legally sufficient to support the finding of fact as to the abandonment [citations.]" ' " (*Allison C.*, at p. 1011.)

### A.  Substantial Evidence Supports That Mother Left Tristan in Father's Care and Custody Within the Meaning of Section 7822

Mother argues she did not "leave" Tristan within the meaning of section 7822 because "there was a 'judicial taking' of custody of Tristan from [her] that [did] not convert[] into a 'leaving' through parental nonaction."  She argues that once the July 2018 custody order was made, she lost her right to custody by judicial decree, not abandonment.

A parent "leaves" a child when they actually desert him or her in another person's care and custody, or voluntarily surrenders the child.  (*Amy A.*, *supra*, 132 Cal.App.4th at p. 69.)  "Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent." (*Ibid.*)  Additionally, "under certain circumstances 'it might be proper to conclude that a parent has "left" a child … despite court intervention[,]' " that is—notwithstanding the existence of a court order.  (*Id.* at p. 70.)

In the present case, there is substantial evidence mother left Tristan in father's care and custody.  (*Amy A.*, *supra*, 132 Cal.App.4th at p. 69.)  In 2018, mother failed to attend the custody hearing that resulted in the custodial order giving father sole custody.  Thereafter, she made no effort to exercise her right to supervised visitation for three years, or seek modification of the custody order.  (*In re Marriage of Jill & Victor D.*

(2010) 185 Cal.App.4th 491, 505 ["[A] parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child."].) Mother did text father various times asking to see Tristan and sent Tristan toys on a few occasions, but these were merely token efforts. (§ 7822, subd. (b) ["If the parent … ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent .…"]; see *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816 [concluding that mother "left" the child when she did not seriously attempt to obtain visitation or modify the custody order removing the child from her care].) The record contains no evidence father attempted to prevent mother from exercising her supervised visitation rights. On the contrary, immediately after the 2018 custody order was made, he went to Heaven's House and completed intake documents and paid the intake fee, but mother failed to do the same and visits did not occur. Accordingly, we conclude substantial evidence supports that mother voluntarily surrendered Tristan's care and custody to father.

B. **Substantial Evidence Supports That Mother Intended to Abandon Tristan**

Mother next contends she did not have the requisite intent to abandon Tristan. As previously mentioned, there is a statutory presumption that a parent who fails to communicate or provide support for one year has an intent to abandon. (§ 7822, subd. (b).) Mother argues she rebutted the presumption because she sent father text messages trying to see Tristan and her failure to seek professionally supervised visitation as required by the court order was due to financial hardship.

There is ample evidence on the basis of which the trial court could base a finding that mother's finances did not prevent her from communicating with Tristan. Mother testified the last time she saw Tristan was in December 2017, at which point she had joint custody of Tristan and unsupervised visits. Mother testified she had moved to Lancaster

9.

from Bakersfield and did not have transportation. The custody order granting father sole custody was awarded in June 2018. Mother testified she did not attend the hearing due to lack of transportation. After the hearing, mother went to Heaven's House to ask about setting up supervised visitation, but did not go forward with the intake because she could not afford the fees. At trial, mother repeatedly testified the reason she could not attend supervised visits was because she could not afford the fees and did not have transportation up until 2021. She said she did not even have $50 to pay for the intake fee prior to 2021. However, she admitted there were multiple buses that went from Lancaster to Bakersfield. In 2019, her boyfriend would give her rides to Bakersfield every month, but she never went to set up visits on any of those occasions or went to the court facilitator's office. In 2019, she paid roommates to take her to work. Then, in 2020, she moved back to Bakersfield with her boyfriend. At one point in 2020, she obtained her own vehicle. She was employed in 2020 and 2021. As the court stated, she was able to pay living expenses, but not the intake fee. The gifts she sent Tristan were not sufficient to constitute support. (See *Allison C.*, *supra*, 164 Cal.App.4th at p. 1012 [holding that $1,100 in monetary support was " 'de minimis,' insufficient, and 'token' " for a three-year period].) In sum, mother failed to make adequate efforts to communicate with Tristan despite having an available outlet by which she could do so (i.e., supervised visitation). Thus, substantial evidence supports the trial court's finding that she intended to abandon him.

## **DISPOSITION**

The judgment is affirmed.