Filed 1/9/24  In re B.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re B.P. et al., Persons Coming Under the Juvenile Court Law. | |
| A.P. et al., | D082281 |
| Plaintiffs and Respondents, | (Super. Ct. No. 22AD000446N) |
| v. | |
| K.K., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela Rae Tripp, for Plaintiffs and Respondents.

I.

Appellant K.K. (Mother) challenges the juvenile court's order terminating her parental rights to her children, B.P. and S.P. (Children), and approving their adoption by their stepmother, A.P. (Stepmother).  Mother

argues there was insufficient evidence to support she "abandoned" Children as required by Family Code section 7822. She contends she did not voluntarily leave Children in the custody of their father, C.P. (Father), but rather lost custody due to a court order. However, although a court-ordered deprivation of custody does not itself constitute abandonment, the court reasonably concluded Mother's voluntary behavior, including failure to comply with a court-ordered psychological evaluation and repeated violations of protective orders, effectively abandoned Children to Father's care and custody.

Mother also claims the evidence does not support she intended to abandon Children. However, intent to abandon is presumed from Mother's undisputed failure to communicate with Children for the statutory period. Despite being granted supervised phone visitation, Mother never exercised that right and made only token efforts to obtain a supervisor. To be sure, Mother's communications with Father—many of which violated protective orders against her—indicate she cared for her children. However, these messages do not support Mother was engaged in reasonable efforts to reestablish a parental relationship with Children.

Mother further claims the court erred by concluding that terminating parental rights was in the best interests of Children. Mother's arguments in support of this contention are immaterial, conclusory, or duplicative of her argument that she did not intend to abandon Children. In sum, we find Mother's arguments unpersuasive and conclude the court's order terminating Mother's parental rights was supported by substantial evidence.

Finally, Mother claims the court violated Welfare and Institutions Code section 224.2, part of the Indian Child Welfare Act (ICWA), by failing to conduct an initial inquiry into whether Children may be "Indian" children.

2

However, California Rules of Court, rule 5.481 provides the applicable ICWA inquiry standard for Family Code section 7822 proceedings. (See Cal. Rules of Court, rule 5.480(4).) Mother focuses exclusively on the initial inquiry requirements of Welfare and Institutions Code section 224.2, which are inapplicable here. She fails to discuss the requirements of California Rules of Court, rule 5.481 or claim these were not satisfied, thus forfeiting any such argument. Accordingly, we affirm.

## II.

### A.

Mother filed for divorce in 2018, and Mother and Father initially shared custody of Children. Several months later, Father requested a restraining order against Mother. According to Father, he had "received phone calls and text messages [from Mother] incessantly any hour of the day, night, messages threatening my job, demanding money, [and] referencing sexual relationships with other men." Father testified that a few months after requesting the restraining order, he "voluntarily got rid of it" because he "wanted to show the court that [he] was willing to work with [Mother] to coparent and try to make life as normal as possible for the children."

In March 2019, the court granted Stepmother a restraining order against Mother. Stepmother testified she sought the order because Mother was sending "threatening, derogatory, disgusting texts, phone calls all the time, day and night, every hour, non-stop." In September 2019, Mother was arrested for violating the restraining order, although charges were ultimately dropped. In May 2020, Mother again violated the March 2019 restraining order. Stepmother testified Mother came to their home, banging on the door and yelling through the windows at her. According to Stepmother, Mother then jumped onto their "balcony and started taking stuff." Stepmother called

3

law enforcement, and a criminal protective order (CPO) was issued to Stepmother and S.P., who was also in the home at the time.

In June 2020, the San Diego Health and Human Services Agency substantiated an allegation that Mother hit B.P. in the face. In July 2020, Children began living with their maternal grandmother, but shortly thereafter were sent to live with their paternal grandmother in New Jersey.

Initially, Mother called and spoke with Children approximately once a week. According to Mother, the paternal grandmother stopped taking her calls after October 2020. According to paternal grandmother, Children decided they did not want to talk on the phone. She denied preventing Children from talking to Mother. Mother's last call with Children occurred in October 2020.

In April 2021, Father was granted a CPO against Mother under Penal Code section 136.2. The order prohibited Mother from contacting Father and ordered her to stay away from his home, work, and vehicle. Stepmother and Children were issued a separate CPO, also pursuant to Penal Code section 136.2. That order prohibited Mother from contacting Children except for "peaceful contact" for the purposes of "court-ordered visitation" as stated in family court orders.

In June 2021, Father was granted sole legal and physical custody of Children. Mother's visitation was limited to one, 15-minute, professionally supervised phone call per week, on Wednesdays at 4:00 p.m., which was to be recorded. Mother was ordered to complete "a comprehensive psychiatric evaluation" to determine her "ability to safely and consistently meet the children's needs." The court ordered the evaluator to prepare "a written report for the Court's consideration."

4

On the morning of July 7, a Wednesday, Father sent Mother a phone number to use for supervised phone calls and said, "Contact information for the professional phone supervisor is required prior to any/all calls being accepted." Three days later, Mother responded, "I really really want to respect you, but I truly cannot when you have alienated me from my kids for almost a year. Then you go and claim it violating an order on YOU when all I care about is the kids . . . . ¶ You either want this to keep going or you don't. ¶ Please stop destroying my life based on your incapacity to know your own emotions." A few minutes later, she added, "I can't talk to the kids from 4 to 415 anymore, I'm working, 6 to 615 would better. ¶ Again, I'm not here for YOU, I'm here to make sure I speak to my children . . . . ¶ Please stop taking [this messaging platform] as your own personal device to destroy me. Thank you." Later that month, Children returned from New Jersey to live with Father full time.

In August 2021, Mother pled guilty to misdemeanor child endangerment and stalking, although the record does not reflect the basis for these charges. She received three years' probation and was ordered to complete a 52-week parenting class. Pursuant to Penal Code section 1203.097, Father and B.P. received a CPO against Mother barring any contact other than "peaceful contact" for the purpose of "court-ordered visitation" in accordance with family court orders issued after the date of the CPO, August 25, 2021.

By October 2021, Mother had not had any supervised visits with Children and had not completed the psychological evaluation ordered by the court. Nonetheless, at a status hearing before the family court in the custody case, she requested modification of the court's recent visitation order, asking for three unsupervised phone calls and up to 12 hours of supervised visitation

per week, proposing her sister as a supervisor. The family court denied the request and maintained the previous visitation order because, according to Father, Mother had not completed her psychological evaluation.

In January 2022, Mother messaged Father a link to a professional supervisor service and said, "[I] want to start calling the children this week." Father testified he has never received any communication from a professional supervisor.

Mother otherwise continued to message Father throughout this period in violation of the CPO, sending Father numerous insults, threats, and accusations. On occasion, she sent messages meant for Children, including: "Happy Easter to my babies"; "Please tell my littles I love and miss them. So much. When you allow me to speak to them, I will gladly pay you whatever you want."; and, "[P]lease tell [Children I] love them and miss them. [M]ore then [sic] they could ever even imagine."

In June 2022, Mother sent B.P. flowers and a card. Father refused delivery.

In January 2023, Mother was convicted of violating one of the protective orders. The criminal court entered a new CPO, this time pursuant to Penal Code section 136.2, subdivision (i)(1), again restricting Mother's contact with Father and B.P.

It is undisputed Mother has not seen Children in person since July 2020 and has not spoken to them since October 2020.

B.

In July 2022, Stepmother filed a request to adopt Children and, along with Father, a Petition for Freedom from Parental Custody and Control under Family Code section 7822, subdivision (a)(3). Mother opposed the petition.

6

The court held a multi-day hearing and heard testimony from Mother, Father, Stepmother, paternal grandmother, maternal grandmother, a social worker who had investigated in connection with the petition, a professional supervisor who had supervised some of Mother's visits with Children, and Children's counsel in the custody proceedings.

The court found in favor of Stepmother and Father. The court concluded the statutory period of one year began in June of 2021, when Father was awarded sole legal and physical custody. The court found Mother had left Children in the custody of Father, noting her failure to "complete what had been ordered from the family court hearings . . . to warrant modification of custody and visitation." The court found Father's testimony "to be more credible than" Mother's, observing that "aspects of the father's testimony [were] corroborated by court orders, corroborated by the stepmother's testimony, and corroborated by minor's counsel, the attorney for the family law case."

The court found Mother had only made token efforts to communicate with Children, concluding Mother had failed to take reasonable steps to obtain a suitable supervisor for her visits. The court found it unreasonable for Mother to expect that messaging Father "would result in contact with the children after the restraining orders continued to be extended, renewed, or granted since 2021 at the father's and stepmother's request." The court observed Mother "continues with the same course of behavior that warranted restraining orders in the first place," which the court found "concerning especially given the fact that the mother indicated that she had completed anger management . . . [and] had completed kids turn, as well as her testimony that she is in the process of completing 49 of the 52 child abuse classes, and that she has engaged in therapy on and off."

The court also found clear and convincing evidence Mother "had the requisite intent to abandon the children" for the statutory period, "as evidenced by her voluntary actions, specifically the failure to comply with the court-ordered psychological evaluation."

Finally, the court found it was in Children's best interests to permit the adoption. The court found Stepmother's testimony credible and found she "has played a consistent role of mother to the children since she has been involved in their life on/or about 2019," noting "the stepmother is the person the children call mom." The court found Stepmother "comfortably testified about the needs of each child as well as about who they are as children, about the different activities that they are involved in, and about her role in parenting them," and she "has shown over the years that she is committed to providing consistency and stability for the children to help them grow and thrive." Accordingly, the court terminated Mother's parental rights and approved Stepmother's adoption of Children.

## III.

Mother makes two principal arguments on appeal. First, she contends there was insufficient evidence to support the court's findings because: (1) she did not "leave" Children with Father because they were taken from her pursuant to a court order; (2) the record supports she did not intend to abandon Children; and (3) termination was not in the best interests of Children. Separately, Mother claims the court violated Welfare and Institutions Code section 224.2 by failing to conduct an initial inquiry into whether Children may be "Indian" children. As we will explain, we find Mother's arguments unpersuasive.

8

A.

Under Family Code section 7822, subdivision (a)(3), a party may file a petition to terminate parental rights if "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child."  "[F]ailure to provide support[ ] or failure to communicate is presumptive evidence of the intent to abandon.  If the parent . . . ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ."  (*Id.*, subd. (b).)  A court ruling on a Family Code section 7822 petition "[must] consider the wishes of the child, bearing in mind the age of the child, and [must] act in the best interest of the child."  (Fam. Code, § 7890.)

"Although a court must make such findings based on clear and convincing evidence ([Fam. Code,] § 7821), the sole issue on appeal is whether substantial evidence supports its conclusions."  (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 922–923.)  "In determining if substantial evidence exists, we consider the evidence in a manner that favors the order being challenged."  (*Ibid.*, citing *Guardianship of Wisdom* (1956) 146 Cal.App.2d 635, 639.)  We have "no power to pass on the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence."  (*In re E.M.* (2014) 228 Cal.App.4th 828, 839.)  Rather, " ' "[a]ll conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment." ' "  (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010-1011 (*Allison C.*).)  " 'The appellant has the burden of showing the finding or order is not supported by substantial evidence.' "  (*Id.* at p. 1011.)

9

## B.

### 1.

Mother first claims she cannot have "left" Children in Father's care and custody for purposes of Family Code section 7822, subdivision (a)(3), because Children were taken from her by court order. Mother concedes "[s]ome courts have held that if after a child is taken against the parent's wishes and that parent does not endeavor to secure the child's return but instead fails to act, their inaction can 'convert[ ]' the earlier taking into a leaving," but urges this court to follow other cases she contends hold otherwise. In fact, "[n]umerous appellate decisions have long agreed that the leaving-with-intent-to-abandon-the-child requirement of [Family Code] section 7822 can be established by evidence of a parent's voluntary inaction after an order granting primary care and custody to the other parent." (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504 (*Marriage of Jill & Victor D.*) [collecting cases].) The cases Mother cites are not contrary to this long line of authority.

Mother first cites *In re Adoption of Cozza* (1912) 163 Cal. 514, 528 (*Cozza*). Mother however fails to acknowledge *Cozza* was disapproved by *In re Adoption of Barnett* (1960) 54 Cal.2d 370. As explained in *In re Adoption of Barnett*, *Cozza* relied on a "rule of strict construction of our adoption statutes in favor of the natural parents." (*In re Adoption of Barnett, supra*, at pp. 377–378.) Specifically, *Cozza* held that in considering a request to terminate parental rights "[e]very intendment should have been in favor of the claim of the [biological] mother under the evidence, and if the statute was open to construction and interpretation should have been construed in support of the right of the natural parent." (*Cozza, supra*, at p. 524.) By contrast, "[t]he purpose of [Family Code section 7822] is to serve the welfare and best interest of a child by providing the stability and security of an

10

adoptive home when those conditions are otherwise missing from the child's life" (Fam. Code, § 7800), and it is to "be liberally construed to serve and protect the interests and welfare of the child" (Fam. Code, § 7801). Because *Cozza* applied a predecessor statute interpreted under an inapplicable canon, its value as precedent here is questionable.

In any event, *Cozza* is not as categorical as Mother suggests. In *Cozza*, Margaret was taken from her mother after her stepfather claimed her sister Mary had "persistent[ly] refus[ed] to obey 'the reasonable and proper orders and directions of her parents or guardians.' " (*Cozza*, *supra*, 163 Cal. at p. 518.) The court observed the mother "and her husband are Italians, having but a limited and imperfect knowledge of the English language and ignorant of our laws," and thus credited mother's professed belief she could not do anything to get Margaret back before the end of the year. (*Id.* at p. 519.) The court nonetheless found that "[s]ince [Margaret was] taken from her, [the mother] has endeavored, through her personal efforts and those of her relations, to secure" Margaret's return. (*Id.* at p. 529.) Once the end of the year came, the mother promptly filed an application with the court seeking to regain custody of Margaret. (*Ibid.*) The petition to terminate parental rights was filed in response to the mother's application. (*Id.* at p. 520.) *Cozza* thus suggests that, even under a strict reading of the statute favoring biological parents, a parent's actions after a child is taken from that parent are relevant—otherwise, the fact the child was taken pursuant to a judicial order would have ended the analysis.

Mother next points to *In re Lisa R.* (1975) 13 Cal.3d 636. In the course of resolving a claim of judicial estoppel, the court stated: "A child taken from a parent by judicial order was not then deemed to have been left in the care and custody of another within the meaning of the statutory provision relied

11

upon," citing *In re Conrich* (1963) 221 Cal.App.2d 662, and *In re Barton* (1959) 168 Cal.App.2d 584. (*In re Lisa R., supra*, at p. 646.) *In re Conrich* holds that "nonaction of the parents may convert into a leaving (and, the other elements present, into an abandonment) that which initially could not be regarded so." (*In re Conrich*, *supra*, at p. 666.) This single, ambiguous sentence in *In re Lisa R.* does not support Mother's broad claim.

Closer to the mark is *In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 755, in which the court held "that evidence of a failure to communicate or support for the statutory period of time can[not], in itself, satisfy the separate statutory requirement that the child be 'left' for a prescribed period of time." However, it is not only the failure to communicate with Children that the court here pointed to as evidence that Mother "left" them, but her repeated violation of protective orders and her failure to obtain a court-ordered psychological evaluation.

"Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent." (See *In re Amy A.* (2005) 132 Cal.App.4th 63, 69.) Mother lost custody due to judicial orders, but these orders were issued in response to Mother's voluntary behavior. Among these voluntary actions was the substantiated incident of child abuse against B.P. in 2020, which resulted in Mother losing physical custody of Children. (Cf. *Allison C.*, *supra*, 164 Cal.App.4th at p. 1012 ["[F]ather, by his voluntary act of domestic violence, left [the child] in mother's care and custody."].) After custody was awarded to Father, Mother failed to make any efforts to regain custody and, as discussed in more detail below, made only token efforts to exercise her visitation rights. (Cf. *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816 ("[M]other's failure to engage in psychological and family counseling, which

12

resulted in termination of visitation rights, and her token efforts to regain visitation rights indicated an abandonment of the child."].) Mother has continued to violate the protective orders in place for years, including as recently as two months before the hearing in this case. All this evidence supports the court's determination that Mother left Children by failing to take reasonable steps under the circumstances toward reestablishing a parental relationship.

Mother criticizes the court's reliance on her failure to complete the court-ordered psychological evaluation, claiming it "would not result in any guaranteed outcome." However, given the court indicated it was requiring the evaluation to ensure Mother could be a safe and consistent caretaker, failing to have an evaluation ensured she would not regain custody. Indeed, Father's unrebutted testimony stated that Mother's request for increased visitation was denied because she had not completed the evaluation.

Mother points to her participation in therapy—"[o]n and off" since 2019—and her testimony that she has been diagnosed with bipolar disorder and regularly takes psychiatrist-prescribed medication. Mother claims this shows she "was committed to addressing any mental health issues and how that may affect her ability to effectively parent the children." Although she has apparently sought support to better meet her mental health needs, Mother has also persisted in troubling behavior. The court reasonably found it "concerning" Mother continued to violate various court orders despite participating in therapy and other court-mandated programming, including anger management. Mother's messages to Father are themselves concerning, as they often contained angry outbursts—for example, telling Father (a veteran), "You are asking for a god damn war. You think Iraq was bad?"— and several messages threatened suicide. Mother has not shown she

13

obviated any mental health concerns and, in any case, does not dispute she has not satisfied the June 2021 court order requiring an evaluation.

Mother also claims her request for increased visitation in October 2021 is not the kind of parental inaction that can result in abandonment. However, it is undisputed Mother never exercised the visitation she had already been granted and, as discussed below, she has made no genuine efforts to do so. Moreover, at the time of her request, Mother had not complied with the family court's prior order mandating a psychological evaluation and, in the intervening months, had pled guilty to misdemeanor child endangerment and stalking. Given her failure to comply with a court-mandated condition intended to ensure her "ability to safely and consistently meet the children's needs," and her continued criminal behavior, there was no reason to expect the court would modify its visitation order entered only four months earlier.

2.

Next, Mother contends there was insufficient evidence to support she intended to abandon Children. She does not dispute the evidence established she failed to communicate with Children for the statutory period. "[F]ailure to communicate is presumptive evidence of the intent to abandon." (Fam. Code, § 7822, subd. (b).) "When the evidence permits the conclusion of only token efforts to communicate with the child, 'Unless the presumption of abandonment raised by [that] fact has been overcome as a matter of law, the findings and order of the trial court . . . must be sustained." (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.) It was Mother's burden to rebut this presumption. (See *Marriage of Jill & Victor D.*, *supra*, 185 Cal.App.4th at p. 506.) We conclude she has not done so.

Mother points to her messages to Father as evidence she was "attempt[ing] to communicate with" Children. As the court found, however, these were not reasonable attempts because Mother was aware she was only permitted supervised visitation with Children and her messages to Father violated court orders.

Mother specifically highlights her January 2022 message to Father that included a link to a professional monitoring service. The court considered this message, sent seven months after the supervised visitation order, and found it was not a serious attempt to secure a supervisor under the circumstances. That conclusion is supported by the evidence.

Minor's counsel sent Mother a court-created list of professional supervisors in June 2021. Mother responded, claiming she did not need a list because she had already contacted a supervisor they had used previously. Minor's counsel responded that Mother's proposed supervisor had "admitted to leaving [Mother and maternal grandmother] unsupervised with the

15

children when he should have been present at all times," and therefore suggested using a different monitor. In response, Mother claimed the supervisor "did nothing wrong" and said, "I will chose [sic] the supervisor I deem suitable."

However, it does not appear Mother actually attempted to secure the services of this supervisor in 2021, as she had claimed. The supervisor testified and the court found him credible. He stated Mother did not contact him in 2021, but instead had done so in late 2022 or early 2023, well after the filing of the petition to terminate parental rights. The court found this statement "compelling, as it goes to the conduct of the mother in not consistently following through with securing a supervisor for the visits with the children to maintain the parent bond . . . even after the mother was provid[ed] a list of supervised visitation monitors and after the concern with [her proposed supervisor] was shared with her."

Similarly, Mother claimed she had contacted another supervisor in June 2021. She claimed this proposed supervisor had reached out to Father and she had discussed this person with minor's counsel. The court did not credit Mother's testimony because both minor's counsel and Father "denied receiving any information regarding this individual," and Mother did not call this supervisor to corroborate her testimony. Indeed, Mother did not present any corroborating evidence, such as call logs or text messages. The court was entitled to disregard Mother's disputed and uncorroborated testimony.

As to the professional monitoring service she proposed in January 2022, this service was not on the list provided by minor's counsel but was a service Mother "had just Googled." There is no indication Mother ever contacted this service. She, moreover, conceded her message violated "a restraining order that prevented [her] from contacting" Father. The record

supports Mother made only a half-hearted effort to obtain a supervisor, even though this was her only legal avenue to communicate with Children. This supports the court's conclusion she intended to abandon them.

Mother also contends she could not have intended to abandon Children because she offered to pay $500 per month in child support to Father. Specifically, in July 2021, Mother messaged Father: "I'm not sending anything over to you, until you end this crusade to end my career. ¶ Can't get a dime from me from prison. ¶ I'm willing to send you 500 a month, that[']s me working overtime two weekends a month, easily. ¶ However I can't do so when you are threatening to put me away for every instance I talk to you. ¶ The ball is in your court. ¶ That's 200 bucks more then you sent me when I had the kids 100%. ¶ Let me know." There is no evidence Mother renewed this offer; she did not send support to Father. This apparently contingent offer of support fairly constitutes a mere "token effort[ ]" to support Children. (Fam. Code, § 7822, subd. (b).) Furthermore, either failure to support *or* failure to communicate with Children provides presumptive evidence of intent to abandon. (*Ibid.*) In light of Mother's undisputed failure to communicate with Children and other circumstances, a one-time offer of financial support is not sufficient to rebut the presumption that she intended to abandon Children for the statutory period.

Finally, Mother claims, vaguely, that "phone calls, . . . gifts, and letters" reflect her intent not to abandon Children. Although mother refers to these "phone calls, . . . gifts, and letters" three times in her opening brief, she does not provide any record citations, in contravention of California Rules of Court, rule 8.204, subdivision (a)(1)(C). "This rule applies to matters referenced at any point in the brief, not just in the statement of facts." (*Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1253.) On reply,

17

the only evidence of "gifts" Mother cites appears to be evidence that she sent flowers and a card to B.P. in June of 2022. Aside from this, her contentions are unsupported. In fact, both Children denied receiving gifts or letters from Mother, and B.P. told a social worker that Mother " 'never called when she was supposed to.' " In the context of the record as a whole, Mother sending flowers to B.P. is not sufficient to establish she did not intend to abandon Children.

In sum, Mother has failed to rebut the presumption that her failure to communicate with Children reflected intent to abandon them for the statutory period.

3.

Mother contends adoption is not in Children's best interests. First, she claims she "loves [Children] and wants to continue as a mother in their life." Mother's love for Children and stated desire to parent them speak to *Mother's* interests but do little to establish what is in *Children's* best interests. Mother next states, "Adoption by [Stepmother] is not in the children's best interests." Mother fails to make any explanatory argument or cite to any evidence in support of this contention. This conclusory statement does not establish the court erred. Finally, Mother claims she "did not intend to abandon" Children. As we have already determined, however, the record supports the court's contrary conclusion. Mother's contentions are, thus, unpersuasive.

C.

Finally, Mother argues the court's order must be overturned because Welfare and Institutions Code section 224.2, subdivisions (a), (b), and (c) required the court and Agency to ask available extended family members whether Children have Indian heritage. However, Welfare and Institutions

18

Code section 224.2 applies to children "for whom a petition under [Welfare and Institutions Code] Section 300, 601, or 602" has been filed. (Welf. & Inst. Code, § 224.2, subd. (a).) This matter undisputedly does not involve a petition under any of those sections.

Mother cites *Adoption of M.R.* (2022) 84 Cal.App.5th 537, 541, which held that the court's failure to make any ICWA findings in connection with a Family Code section 7822 petition was reversible. In passing, the court suggested Family Code section 177 incorporates Welfare and Institutions Code section 224.2 to the Family Code, stating: "The notice and inquiry requirements of the Welfare and Institutions Code apply to proceedings under . . . the Family Code (Fam. Code, § 177 [Welf. & Inst. Code, §§ 224.2 through 224.6 apply to an Indian child custody proceeding])." (*Ibid.*) It appears Mother relies on this reading of the statute for the proposition that Welfare and Institutions Code section 224.2, subdivisions (a), (b), and (c) applies to this case. Not so.

As *Adoption of M.R.* correctly recites, Family Code section 177 says Welfare and Institutions Code sections 224.2 through 224.6 apply to an "*Indian child* custody proceeding." (Italics added.) An " 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903; Fam. Code, § 170.) Mother does not contend Children are "Indian children" for purposes of the statute, and in fact has denied Indian heritage. Father similarly denied Children were "Indian" children. As such, Welfare and Institutions Code section 224.2 does not apply to this proceeding.

ICWA inquiry requirements do apply to proceedings under Family Code section 7822, as set out in California Rules of Court, rule 5.481. (Cal.

19

Rules of Court, rule 5.480, subd. (4).) However, Mother does not dispute the Rule 5.481 standards were met and thus forfeits any such argument. (See, e.g., *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726.) Mother argues exclusively under the assumption that Welfare and Institutions Code section 224.2 applies. Because we conclude it does not, Mother has failed to establish ICWA error.

IV.

The juvenile court's findings and orders are affirmed.


CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.